Versión para imprimir

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| PEPSI-COLA MANUFACTURING INTERNATIONAL LIMITED; PEPSICO PUERTO RICO, INC.<br><br>Peticionarios<br><br>v.<br><br>DIRECTOR DE FINANZAS DEL MUNICIPIO AUTÓNOMO DE CIDRA Y OTROS<br><br>ELIZABETH APONTE RIVERA, EN SU CAPACIDAD OFICIAL COMO DIRECTORA DE LA OFIC. DE EXENCIÓN CONTRIBUTIVA INDUSTRIAL DEL DEPTO. DE ESTADO, ESTADO LIBRE ASOCIADO DE PUERTO RICO<br><br>Recurridos<br>-------------------------------<br>PEPSI-COLA MANUFACTURING INTERNATIONAL LIMITED; PEPSICO PUERTO RICO, INC.<br><br>Recurridos<br><br>v.<br><br>DIRECTOR DE FINANZAS DEL MUNICIPIO AUTÓNOMO DE CIDRA Y OTROS<br><br>ELIZABETH APONTE RIVERA, EN SU CAPACIDAD OFICIAL COMO DIRECTORA DE LA OFIC. DE EXENCIÓN CONTRIBUTIVA INDUSTRIAL DEL DEPTO. DE ESTADO, ESTADO LIBRE ASOCIADO DE PUERTO RICO<br><br>Peticionarios | Certiorari<br><br>2012 TSPR 143<br><br>186 DPR ____ |

Número del Caso: CC-2008-136
            Cons.
            CC-2008-140


Fecha: 25 de septiembre de 2012


Tribunal de Apelaciones:

        Región Judicial de Caguas

## CC-2008-140

Oficina del Procurador General:

> Lcdo. Salvador Antonetti Stutts
> Procurador General
>
> Lcdo. José Torres Asencio
> Procurador General Auxiliar
>
> Lcdo. Pedro J. Cabán Vales
> Procurador General Auxiliar

Abogado del Recurrido:

> Lcdo. Héctor Hernández Soto

## CC-2008-136

Abogado del Peticionario:

> Lcdo. Juan Acosta Reboyras
> Lcdo. Julio Eduardo Torres

Abogado del Recurrido:

> Lcdo. Eduardo H. Martínez Echevarría

Oficina del Procurador General:

> Lcda. Ileana M. Oliver Falero
> Subprocuradora General Interina
>
> Lcdo. Luis Torres Asencio
> Procurador General Auxiliar

Materia: Contribuciones Municipales

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| PEPSI-COLA MANUFACTURING INTERNATIONAL LIMITED; PEPSICO PUERTO RICO, INC.<br><br>Peticionarios<br><br>v.<br><br>DIRECTOR DE FINANZAS DEL MUNICIPIO AUTÓNOMO DE CIDRA Y OTROS<br><br>ELIZABETH APONTE RIVERA, EN SU CAPACIDAD OFICIAL COMO DIRECTORA DE LA OFIC. DE EXENCIÓN CONTRIBUTIVA INDUSTRIAL DEL DEPTO. DE ESTADO, ESTADO LIBRE ASOCIADO DE PUERTO RICO<br><br>Recurridos | Núm.: **CC-2008-0136**<br><br>consolidado con<br><br>**CC-2008-0140** | *Certiorari* |
| PEPSI-COLA MANUFACTURING INTERNATIONAL LIMITED; PEPSICO PUERTO RICO, INC.<br><br>Recurridos<br><br>v.<br><br>DIRECTOR DE FINANZAS DEL MUNICIPIO AUTÓNOMO DE CIDRA Y OTROS<br><br>ELIZABETH APONTE RIVERA, EN SU CAPACIDAD OFICIAL COMO DIRECTORA DE LA OFIC. DE EXENCIÓN CONTRIBUTIVA INDUSTRIAL DEL DEPTO. DE ESTADO, ESTADO LIBRE ASOCIADO DE PUERTO RICO<br><br>Peticionarios | | |

Opinión del Tribunal emitida por el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 25 de septiembre de 2012.

En el presente caso revisaremos la impugnación del pago de patentes municipales, cobradas por el Municipio de Cidra (Municipio) en calidad de deficiencias adeudadas de conformidad con la Ley Núm. 113 de 10 de julio de 1974, según enmendada, conocida como Ley de Patentes Municipales.[1] Específicamente, se cuestiona la manera en que se debe calcular el volumen de negocios atribuibles a operaciones llevadas a cabo en un municipio por una empresa acogida a la Sección 936 del Código Federal de Rentas Internas (Sección 936),[2] según enmendada, la cual también goza de un decreto de exención contributiva en virtud de la Ley Núm. 135-1997,[3] conocida como Ley de Incentivos Contributivos de 1998.[4]

Analizaremos, además, si la Oficina de Exención Contributiva Industrial (OECI) está autorizada a enmendar un decreto con efecto retroactivo en aras de aclarar los términos de un pacto entre el Gobierno de Puerto Rico y el recipiente de unos beneficios contributivos.

---

[1]     21 L.P.R.A. sec. 651 *et seq.* (2005).

[2]     26 U.S.C.A. sec. 936.

[3]     13 L.P.R.A. sec. 10101 *et seq.* (2007), hoy derogada.

[4]     La ley hoy vigente sobre esta materia es la Ley Núm. 73-2008 (13 L.P.R.A. sec. 10641 *et seq.* (Supl. 2011)), conocida como Ley de Incentivos Económicos para el Desarrollo de Puerto Rico.  No obstante, dado que los hechos del caso de autos ocurrieron durante la vigencia de la Ley de Incentivos Contributivos de 1998, nos limitaremos a su aplicación.

**I**

PepsiCo Puerto Rico, Inc. (PepsiCo), una corporación organizada bajo las leyes del estado de Delaware, se dedica a la venta y manufactura de productos alimenticios en Puerto Rico. Acogida a la Sección 936, PepsiCo eligió el método de contabilidad de *profit split* para calcular sus ingresos tributables a nivel federal. 26 U.S.C.A. sec. 936(h)(5)(C)(ii). En resumen, esta fórmula estatutaria designa el cincuenta por ciento (50%) del ingreso generado por las ventas de mercancía producida por PepsiCo en Puerto Rico como el ingreso del negocio sujeto a contribuciones federales.

A su vez, PepsiCo también ha gozado de varias exenciones contributivas puertorriqueñas implantadas a través de decretos emitidos por el Gobierno de Puerto Rico. Su decreto original[5] fue otorgado en el año 1977 bajo la Ley Núm. 57 de 13 de junio de 1963, conocida como Ley de Incentivo Industrial de Puerto Rico de 1963.[6] Cabe señalar que, según enmendado, ese primer decreto[7] al 4 de octubre de 1989 disponía que para efectos de computar sus patentes municipales el volumen de negocio de PepsiCo sería equivalente al cincuenta por ciento (50%) de dicho volumen, de estar acogido al método de *profit split*.

---

[5]     Decreto No. 77-57-I-113.

[6]     13 L.P.R.A. sec. 10012 *et seq.* (2007), hoy derogada.

[7]     Decreto No. EI-89-123 (77-57-I-113)-C.

PepsiCo luego renovó su exención contributiva con el Gobierno de Puerto Rico en el año 2000, esta vez bajo la Ley de Incentivos Contributivos de 1998. Aprobado el 3 de febrero de 2000 por el Secretario de Estado, el nuevo decreto[8] le extendió a PepsiCo un sesenta por ciento (60%) de exención sobre las patentes municipales, arbitrios municipales y otras contribuciones municipales impuestas por ordenanza comenzando el 1 de julio de 2000. El decreto leía, en su parte aquí relevante, como sigue:

> BE IT FURTHER DECREED, that pursuant to Section 6(b)[9] of the Act, Grantee shall enjoy sixty percent (60%) exemption from license fees, excises, and other Municipal Taxes of: (i) July 1, 2000 with respect to the production of concentrate products, and (ii) July 1, 2002 with respect to the production of snack foods and pork rind pellets ("chicharrones").

(Nota al calce nuestra). Sin embargo, en el documento no se incluyó un párrafo similar al del decreto original especificando que se habría de computar el volumen de negocios para propósitos de las patentes municipales acorde con el método de *profit split*.

Este segundo decreto de PepsiCo se enmendó el 5 de agosto de 2002 para incluir a Pepsi-Cola Manufacturing International, Limited (Pepsi-Cola), una corporación existente bajo las leyes de Bermuda, como beneficiario

---

[8]    Decreto No. 98-135-I-111.

[9]    13 L.P.R.A. sec. 10105(b) (2007).

adicional de las exenciones contributivas.[10]    A comienzos del próximo año, PepsiCo vendió a Pepsi-Cola su planta de manufactura de concentrado de bebidas, localizada en el Municipio, y ésta a su vez continuó a cargo de la producción.[11]

El presente litigio surgió a raíz de una alegada deficiencia en el pago de patentes municipales de Pepsi al Municipio, correspondiente a los años contributivos del 2000 al 2004.  Según el Municipio, la deuda se debe a que Pepsi erróneamente computó las patentes a base del cincuenta por ciento (50%) de su volumen de negocio, exención que alegadamente no estaba contemplada en el decreto que entonces poseía, ni en la Ley de Patentes Municipales.  A tal efecto, el 16 de agosto de 2005 el Director de Finanzas del Municipio le notificó a Pepsi que la deficiencia resultante ascendía a quince millones ochenta y siete mil ciento treinta y cuatro dólares con sesenta y seis centavos ($15,087,134.66).

El 19 de agosto de 2005, Pepsi oportunamente solicitó una vista administrativa ante el Municipio para solicitar la reconsideración de las deficiencias notificadas.  La misma se celebró el 5 de octubre de 2005.[12]  Durante la

---

[10]    Decreto No. EI-01-92 (98-135-I-111)-A.

[11]    Para efectos del resto de esta Opinión, nos referiremos a PepsiCo y Pepsi-Cola conjuntamente como "Pepsi".

[12]    La notificación de deficiencia del Municipio de Cidra (Municipio) y la reconsideración solicitada se llevaron a cabo de conformidad con la Sección 16 de la Ley de Patentes Municipales, según enmendada.  21 L.P.R.A. sec. 651o (2005).

vista, se les concedió a los contribuyentes un término para someter un memorando sobre los hechos y el derecho. Sometido los memorandos, el 9 de noviembre de 2005 se señaló la continuación de la vista para la argumentación oral de las partes para el 17 de noviembre del mismo año.

En su memorando Pepsi argumentó, en síntesis, que la interpretación dada por el Municipio a la Ley de Patentes Municipales era errónea y frustraba la intención legislativa, toda vez que en el caso de un negocio exento bajo la Ley Núm. 8 de 24 de enero de 1987, conocida como Ley de Incentivos Contributivos de 1987,[13] y otras leyes de incentivos contributivos anteriores, la Sección 9(27) de la ley eximía del pago de patentes los ingresos no atribuibles a operaciones en Puerto Rico de conformidad con la Sección 936.  21 L.P.R.A. sec. 651h(27) (2005). Señaló que, acorde a su elección de *profit split*, método provisto por la Sección 936, el cincuenta por ciento (50%) de los ingresos de Pepsi se imputaba al grupo afiliado de Pepsi y, por consiguiente, no se consideraba atribuible a operaciones llevadas a cabo en la Isla.  En vista de ello, adujo que actuó correctamente al calcular sus patentes municipales a base de la mitad de los ingresos informados.

El Municipio, por su parte, refutó que la mencionada exención de patentes municipales le beneficiaba a Pepsi debido a que ésta era una corporación exenta bajo la Ley

---

[13] 13 L.P.R.A. sec. 10038 *et seq.* (2007), hoy derogada.

de Incentivos Contributivos de 1998, y el texto de dicho estatuto expresamente limitaba su aplicación a negocios exentos bajo la Ley de Incentivos Contributivos de 1987 y leyes anteriores.

El 14 de noviembre de 2005, mientras se dilucidaba el proceso de reconsideración ante el Municipio, Pepsi solicitó una enmienda aclaratoria al decreto de exención contributiva aprobado en el año 2000 ante la OECI, entidad adscrita al Departamento de Estado y encargada de administrar la concesión de decretos.[14] La enmienda propuesta por Pepsi leía de la siguiente forma:

> BE IT FURTHER DECREED, that pursuant to Section 6(b) of the Act, Grantee shall enjoy sixty percent (60%) exemption from license fees, excises and other Municipal Taxes <u>as of: (i) July 1, 2000</u> with respect to the production of concentrate products, and (ii) July 1, 2002 with respect to the production of snack foods and pork rind pellets ("chicharrones"), <u>provided that Grantee's sales volume with respect to sales covered by profit-split election under Section 936 of the United States Internal Revenue Code of 1986 shall be fifty percent (50%) of the sales amount</u>, and its sales volume with respect to sales covered by the cost sharing election shall be one hundred percent (100%) of the sales amount.

(Énfasis nuestro).

Antes de notificar la determinación final sobre la alegada deficiencia en el pago de patentes municipales, el Municipio fue notificado de dicha solicitud de enmienda y

---

[14]   13 L.P.R.A. sec. 10112 (2007).

éste se opuso a su aprobación.[15] Sus fundamentos principales fueron que la OECI no tenía facultad delegada por la Ley de Incentivos Contributivos de 1998 para conceder la enmienda solicitada, como tampoco la tenía para aprobar una enmienda de carácter retroactivo. Además, señaló que la exención procurada por Pepsi contravendría la definición del concepto de volumen de negocios dispuesta en la Ley de Patentes Municipales. 21 L.P.R.A. sec. 651a(a)(7) (2005).

Sin embargo, la Compañía de Fomento Industrial y el Departamento de Hacienda favorecieron la enmienda solicitada.[16]

El 14 de diciembre de 2005, estando aun pendiente la decisión de la OECI, el Municipio confirmó las deficiencias preliminarmente notificadas a Pepsi. Inconforme, el 12 de enero de 2006, Pepsi presentó una *Demanda* en contra del Municipio en el Tribunal de Primera Instancia, Sala Superior de Caguas, impugnando la imposición de las patentes municipales supuestamente adeudadas.[17]

---

[15] El 29 de noviembre de 2005, el Municipio presentó ante la Oficina de Exención Contributiva Industrial (OECI) un *Memorando en Oposición a Propuesta Enmienda al Decreto de Exención Contributiva Industrial.*

[16] El Municipio reiteró su desacuerdo con la concesión de la enmienda en otras dos (2) ocasiones. Éstas ocurrieron el 8 de febrero de 2006 mediante su *Réplica en Torno a (Denominado) Memorando en Oposición a Propuesta Enmienda al Decreto de Exención Contributiva Industrial Presentado por la Parte Peticionaria* (énfasis en original); y el 23 de marzo de 2006 a través de su *Memorando en Oposición a Borrador de Enmienda al Decreto de Exención Contributiva Industrial Presentado por la Compañía de Fomento Industrial.*

[17] Pepsi también prestó una fianza por la cantidad total de dieciséis millones cuatrocientos cuarenta y cuatro mil novecientos setenta y seis dólares con setenta y nueve centavos ($16,444,976.79), monto equivalente a la

Así las cosas, el 2 de junio de 2006 la OECI aprobó la enmienda a la exención contributiva solicitada por Pepsi con aplicación retroactiva al 3 de febrero de 2000, fecha en que el decreto comenzó a regir. En consecuencia, el 15 de junio de 2006, el Municipio instó una *Demanda Contra Tercero* trayendo al pleito a la OECI y al Estado. En la misma solicitó una sentencia declaratoria que declarara nula la enmienda al decreto de exención contributiva industrial concedida, por constituir un acto *ultra vires*.

Entre las múltiples mociones presentadas ante el tribunal de instancia, destacamos que el Estado sometió una *Moción Solicitando Desestimación* de la *Demanda Contra Tercero* y Pepsi presentó una *Moción Solicitando Sentencia Sumaria*. El Municipio se opuso a ambas, y a su vez solicitó, en la alternativa, que se dictase sentencia sumaria a su favor. En particular, el Municipio alegó que existía una controversia de hechos materiales debido a que los ingresos informados por Pepsi al Municipio en su planilla de patentes municipales no concordaban con aquéllos informados al Departamento de Hacienda.

El 29 de marzo de 2007, el foro de instancia determinó que no existía controversia sustancial de hechos

deficiencia más el nueve por ciento (9%) de la misma por concepto de intereses, conforme la Sección 16 de la Ley de Patentes Municipales, según enmendada. 21 L.P.R.A. sec. 651o (2005).

que impidiera se resolviese el litigio por la vía sumaria. Determinó "que una vez la [OECI] aprobó la enmienda al decreto de exención contributiva industrial con aplicación retroactiva al 3 de febrero de 2000 la controversia planteada quedó aclarada por lo que la determinación del Municipio Autónomo de Cidra en torno a las deficiencias notificadas a Pepsi no puede prevalecer". También entendió que, conforme la Sección 15 de la Ley de Incentivos Contributivos de 1998, no procedía la revisión judicial de la otorgación de la enmienda al decreto de exención por ser una determinación del Secretario de Estado. 13 L.P.R.A. sec. 10114(a) (2007). Por consiguiente, declaró *Ha Lugar* la *Demanda* de Pepsi, dejando de este modo sin efecto la determinación final de deficiencia emitida por el Municipio, y *No Ha Lugar* la *Demanda Contra Tercero* del Municipio.

Inconforme, el Municipio acudió en alzada ante el Tribunal de Apelaciones. El 10 de agosto de 2007, el foro apelativo intermedio emitió *Sentencia* revocando al Tribunal de Primera Instancia y ordenando la celebración de un juicio en su fondo por alegadamente existir una controversia de hechos en cuanto al por qué Pepsi reportó una cantidad o volumen de negocio al Departamento de Hacienda que no concordaba con aquella informada al Municipio. Sin embargo, el Tribunal de Apelaciones confirmó al foro de instancia a los efectos de que, según

la Ley de Incentivos Contributivos de 1998, carecía de competencia para revisar la enmienda al decreto de exención concedida a Pepsi.

De dicha Sentencia, tanto el Municipio como el Estado solicitaron su reconsideración ante el Tribunal de Apelaciones. El primero procuraba que la enmienda se declarara nula, y el segundo, que se dispusiera expresamente que la *Demanda Contra Tercero* no procedía. En cambio, el foro apelativo intermedio acogió dicha solicitud de reconsideración requiriéndole a las partes que se expresaran en torno a las siguientes tres (3) interrogantes: (1) la legalidad de la actuación del Secretario de Estado otorgándole retroactividad al decreto de exención contributiva; (2) si la OECI podía dejar sin efecto una contribución ya adeudada al Municipio, por el tiempo que el decreto estuvo vigente; y (3) si la actuación de la OECI requería la intervención de la rama legislativa, o la legislatura municipal.

Sometidos los escritos responsivos de Pepsi y el Estado, el Tribunal de Apelaciones emitió *Sentencia en Reconsideración* revocando en su totalidad la sentencia sumaria emitida por el foro de instancia y declarando que existían varias controversias de hechos que requerían la celebración de un juicio en su fondo. Entre éstas, mencionó que si Pepsi informó ingresos diferentes ante el Municipio y el Departamento de Hacienda, ello podría ser

considerado conducta ilegal, dolosa o fraudulenta. También señaló que al conceder la enmienda retroactiva, la OECI encubrió los actos de Pepsi, por lo que se debería determinar si los funcionarios públicos envueltos en dicha decisión tienen responsabilidad legal por los perjuicios económicos causados al Municipio. Por último, dispuso que la enmienda al decreto "no [podía] tener una retroactividad que [privara] al Municipio de su facultad de cobrar las patentes municipales, que se han tomado como base para sus operaciones fiscales". Sentencia en Reconsideración del Tribunal de Apelaciones, pág. 4.

Pepsi recurrió ante nosotros oportunamente mediante recurso de *certiorari* número CC-2008-136, planteando los siguientes cuatro (4) errores:

1. Incidió el Hon. TA al hacer imputaciones especulativas e infundadas a Pepsi y al resolver que hay controversia de hechos que requieren vista evidenciaria.

2. Incidió el Hon. TA al reconocerle al Municipio de Cidra legitimación activa para impugnar la determinación de la OECI.

3. Incidió el Hon. TA al negarle validez al decreto de exención contributiva enmendado.

4. Incidió el Hon. TA al revocar al TPI a pesar de que bajo el estado de derecho vigente, aún sin la enmienda al decreto, la deficiencia era improcedente.

Igualmente, el Estado también acudió ante nos mediante el recurso de *certiorari* número CC-2008-140, alegando los siguientes tres (3) errores:

1. Erró el Tribunal de Apelaciones al concluir que la enmienda al decreto de exención contributiva concedido a Pepsi es revisable por los tribunales y que el Municipio de Cidra tiene legitimación activa para impugnar la misma.

2. Erró el Tribunal de Apelaciones al concluir que la enmienda al decreto de exención contributiva concedido a Pepsi fue retroactiva.

3. Erró el Tribunal de Apelaciones al concluir que la [OECI] no tiene facultad para enmendar los decretos de exención contributiva que concede de manera retroactiva.

### A. *Moción de Desestimación*

El 29 de febrero de 2008 el Municipio de Humacao, que había presentado una solicitud para comparecer como *amicus curiae* ante el Tribunal de Apelaciones, presentó una *Moción de Desestimación* en el recurso número CC-2008-136. Planteó que no se perfeccionó el *recurso* de Pepsi debido a que ésta nunca le cursó la debida notificación dentro del término jurisdiccional aplicable. Apoyó su argumento con el hecho de que se le habían notificado tanto la *Sentencia en Reconsideración* del Tribunal de Apelaciones como el recurso del Estado presentado ante este Foro. Pepsi se opuso a la moción del Municipio de Humacao.

Luego de considerar la misma, declaramos *No Ha Lugar* la *Moción de Desestimación* del Municipio de Humacao. Aun asumiendo que el Tribunal de Apelaciones le autorizó a comparecer como *amicus curiae* en el caso de autos, un *amicus curiae* no es parte de los procedimientos para

efectos de solicitar una revisión judicial.  Véase, por

ejemplo, <u>JP, Plaza Santa Isabel v. Cordero Badillo</u>, 177

D.P.R. 177, 188, 191 (2009) ("[N]o es suficiente para ser considerado 'parte' que a una persona se le haya notificado de la resolución administrativa", como tampoco "se considera[] 'parte' [el *amicus curiae*] a los efectos de notificar copia de los recursos de revisión….") (citando <u>Junta Dir. Portofino v. P.D.C.M.</u>, 173 D.P.R. 455 (2008) y <u>Lugo Rodríguez v. J.P.</u>, 150 D.P.R. 29 (2000)).

## B. *Solicitud de Comparecencia como* Amicus Curiae

Por otro lado, el 30 de mayo de 2008 emitimos *Resolución* expidiendo el auto solicitado y ordenando la consolidación de los recursos de Pepsi y el Estado. Después de presentados los alegatos de las partes, el caso quedó sometido para adjudicación en sus méritos por este Tribunal el 29 de agosto de 2008. No obstante, el 18 de septiembre de 2008 la Asociación de Alcaldes de Puerto Rico (Asociación de Alcaldes) presentó una *Solicitud de Comparecencia como Amicus Curiae*, junto con su alegato. Pepsi objetó dicha intervención, señalando que resultaba tardía conforme la Regla 43 del Reglamento de este Tribunal entonces vigente, la cual establecía que la petición de comparecencia como *amicus curiae* "deberá ser presentada por lo menos diez (10) días antes de ser sometido el asunto para su decisión".[18]   4 L.P.R.A. Ap.

---

[18]   La Regla 43 del nuevo Reglamento de este Tribunal, el cual entró en vigor en enero del 2012, es prácticamente idéntica a la anterior. <u>In re: Reglamento del Tribunal Supremo de Puerto Rico</u>, 2011 T.S.P.R. 174, 183 D.P.R. ___ (2011).

XXI-A, R. 43 (2002).  Le asiste la razón.  La Asociación de Alcaldes debió haber notificado su interés de unirse al caso de autos en o antes del 19 de agosto de 2008.  Por lo tanto, se declara la solicitud de la Asociación de Alcaldes arriba indicada *No Ha Lugar*.  Véase Hernández Torres v. Hernández Colón *et al.*, 127 D.P.R. 974 (1991); Pueblo v. González Malavé, 116 D.P.R. 578 (1985); Pueblo ex rel. L.V.C., 110 D.P.R. 114 (1980).

Resueltos estos asuntos preliminares, procedemos a disponer de las controversias planteadas por las partes. Comenzamos con un análisis del estado de derecho entonces vigente para determinar la manera de calcular las patentes municipales de Pepsi, previo a ser enmendado el decreto de exención.

## II

### A.   La Sección 936 del Código Federal de Rentas Internas

Desde la década del 1920, la política del Congreso de los Estados Unidos ha sido eximir de tributación federal los ingresos que sus corporaciones domésticas generan en sus posesiones, entre las cuales se incluye Puerto Rico. Carlos E. Díaz Olivo, *La Autonomía de Puerto Rico y sus Lecciones en Términos Fiscales y Económicos*, 74 Rev. Jur. U.P.R. 263, 276 (2005); Francisco Hernández-Ruíz, *A Guide Across the Spectrum of Section 936*, 19 Rev. Jur. U. Inter. P.R. 131 (1984).  Este beneficio se consignó en la Sección

936 del Código Federal de Rentas Internas.  26 U.S.C.A. sec. 936.  La típica "empresa 936" o "*possessions corporation*" en inglés, como llegó a conocerse, era una subsidiaria de una corporación matriz dedicada a la fabricación de productos compuestos de materiales ajenos a la posesión, y que luego eran reenviados a los Estados Unidos para su consumo (empresas 936).  Nancy H. Kaufman, *Puerto Rico's Possessions Corporations: Do the TEFRA Amendments Go Too Far?* 1984 Wis. L. Rev. 531, 532 (1984).

El Gobierno de Puerto Rico aprovechó esta ventaja estratégica para fomentar su desarrollo económico y atrajo negocios continentales a la Isla a través de incentivos contributivos adicionales.  De esta manera, las empresas 936 gozaban de exenciones locales adicionales a las que les brindaba la Sección 936.  Díaz Olivo, op. cit. págs. 277-278; Hernández-Ruíz, op. cit. pág. 132.

Dentro de este marco tributario, muchas corporaciones matrices empezaron a manipular la contabilidad del comercio interno entre sus afiliadas.  Particularmente, transferían sin costo alguno la titularidad de su propiedad intangible, después de desarrollada en los Estados Unidos, a una afiliada en las posesiones para así maximizar los márgenes de ganancias libres de impuestos.  Díaz Olivo, op. cit. pág. 280; Hernández-Ruíz, op. cit. págs. 135-136; Alan B. Stevenson, *TEFRA—Changes to Section 936*, 35 The Tax Executive 167, 167 (January 1983).  Como

consecuencia de esta práctica, en el año 1982 el Congreso federal enmendó la Sección 936 significativamente. Díaz Olivo, op. cit. pág. 280; Hernández-Ruíz, op. cit. págs. 136-137; Kaufman, op. cit. págs. 544-545, 558. Como parte de los cambios, se añadió la subsección (h) para establecer contribuciones federales sobre ingresos atribuibles a la propiedad intangible de empresas 936.[19] 26 U.S.C.A. sec. 936(h). Esta nueva legislación ofreció, como alternativa a la regla general implantada, la opción de elegir el método de *profit split* para computar la contribución federal.[20] 26 U.S.C.A. sec. 936(h)(5).

Bajo la elección de *profit split*, el ingreso tributable de una corporación 936 que sea derivado con respecto a la producción de unidades de mercancía o el rendimiento de servicios llevados a cabo, total o parcialmente en una posesión, equivale al cincuenta por ciento (50%) del ingreso tributable combinado procedente de la venta de dicha mercancía o servicios a una entidad

---

[19]    Las enmiendas a la Sección 936 del año 1982 no fueron suficientes para que sobreviviera la disposición contributiva. En el año 1996, el Congreso federal acordó eliminar por completo la Sección 936 gradualmente durante un periodo de diez (10) años. Carlos E. Díaz Olivo, *La Autonomía de Puerto Rico y sus Lecciones en Términos Fiscales y Económicos*, 74 Rev. Jur. U.P.R. 263, 280-281 (2005); Andrés Ramírez Marcano, *Más Allá de la Sección 936: El Futuro Económico de Puerto Rico para el Año 2000*, 32 Rev. Jur. U. Inter. P.R. 207, 213 (1997).

[20]    La otra opción a elegir incluida en la Sección 936(h) se llamaba *cost sharing*. 26 U.S.C.A. sec. 936(h)(5)(C)(i).

que no forma parte del grupo de afiliadas de la corporación matriz.  26 U.S.C.A. sec. 936(h)(5)(C)(ii).[21] Es decir, el cincuenta por ciento (50%) de los ingresos tributables combinados generados por la venta a un tercero de un producto que se manufacturó entera o parcialmente en Puerto Rico es imputado a la empresa 936, y por lo tanto estará libre de contribuciones federales bajo la Sección 936.  El otro cincuenta por ciento (50%) de los ingresos se imputa a las afiliadas estadounidenses.[22]  Hernández-

---

[21]    La Sección 936(h)(5)(C)(ii), en su parte pertinente, disponía:

(ii) Profit split.—

(I) General rule.--If an election of this method is in effect, the electing corporation's taxable income derived from the active conduct of a trade or business in a possession with respect to units of a product produced or type of service rendered, in whole or in part, by the electing corporation shall be equal to 50 percent of the combined taxable income of the affiliated group (other than foreign affiliates) derived from covered sales of units of the product produced or type of service rendered, in whole or in part, by the electing corporation in a possession.

....

(IV) Covered sales.--For purposes of this paragraph, the term "covered sales" means sales by members of the affiliated group (other than foreign affiliates) to persons who are not members of the affiliated group or to foreign affiliates.

26 U.S.C.A. sec. 936(h)(5)(c)(ii).

[22]    La sección del reglamento del Código Federal de Rentas Internas dedicada a preguntas y respuestas sobre *profit split* disponía:

Combined taxable income of the possessions corporation and affiliates from the sale of the possession product will include income attributable to all intangibles, including both manufacturing and marketing intangibles, associated with the product.

....

The profit split option is applied to the taxable income of the possessions corporation from sales of the possession product to foreign affiliates and unrelated persons.  Fifty percent of that income is allocated to the possessions corporation, and the remainder is allocated to the appropriate affiliates....

....

Income allocated to the possessions corporation shall be treated as possession source income and as derived from the active conduct of a trade or business within the possession.

Ruíz, op. cit. págs. 146-147; Kaufman, op. cit. págs. 555-557; Snson, op. cit. pág. 176.

**B. El efecto que la Sección 936 tuvo sobre las leyes contributivas puertorriqueñas**

Aunque la Sección 936 y el método de *profit split* sólo rigen en el ámbito federal, y en nada restringen al Gobierno de Puerto Rico en cuanto a su poder soberano de establecer sus propias leyes contributivas,[23] el estado de derecho contributivo puertorriqueño se vio afectado como consecuencia de las enmiendas federales antes descritas.

Por ejemplo, el Departamento de Hacienda de Puerto Rico tomó medidas reglamentarias bajo la entonces vigente Ley de Contribuciones sobre Ingresos de 1954,[24] para reconocer y honrar el nuevo trato a las empresas 936 conforme la Sección 936(h). El 19 de febrero de 1987, se aprobó el Reglamento Núm. 3415 del Departamento de Hacienda (Reglamento Núm. 3415), titulado "Enmiendas y Adiciones al Reglamento Relativo a la Ley de Contribuciones Sobre Ingresos de 1954, según enmendada, aprobado en 11 de julio de 1957". El Artículo 41A-6 de dicho reglamento disponía, en su parte pertinente, lo siguiente:

> Artículo 41A-6. - Ajustes al Ingreso Neto en el Caso de Corporaciones Extranjeras Residentes

---

26 C.F.R. 1.936-6, sec. (b)(1) (respuestas núm. 6, 8 y 14), págs. 171, 176.

[23] Véase Art. VI, Sec. 2, Const. P.R., L.P.R.A., Tomo 1; Interior Developers v. Mun. de San Juan, 177 D.P.R. 693, 703 (2009).

[24] 13 L.P.R.A. sec. 3001 *et seq.* (2007), hoy derogada.

Sujetas a Contribución sobre Ingresos Federal bajo la Sección 936 del Código de Rentas Internas Federal de 1954, según enmendado. — El ingreso neto derivado por una corporación extranjera residente la cual está sujeta a contribución sobre ingresos federal bajo la Sección 936 del Código de Rentas Internas Federal de 1954, según enmendado, (a la cual nos referiremos de aquí en adelante como "corporación de las posesiones") de la conducción activa de una industria o negocios en Puerto Rico, será igual al ingreso neto computado por la corporación de las posesiones bajo el inciso (h) de la referida Sección 936;….

Posteriormente, bajo el nuevo Código de Rentas Internas de Puerto Rico de 1994, 13 L.P.R.A. sec. 8001 *et seq.* (2007), se especificó estatutariamente que el Secretario de Hacienda reglamentaría las disposiciones especiales sobre el trato a las empresas 936 y la forma de determinar el ingreso neto de este tipo de contribuyente. 13 L.P.R.A. sec. 8442(g) (2007).[25] El Secretario de Hacienda aprobó el 3 de abril de 1998 el Reglamento Núm. 5780, según enmendado. El Artículo 1042-7 de dicho reglamento, en lo relativo al ingreso neto, dispuso lo siguiente en términos casi idénticos al derogado Reglamento Núm. 3415:

El ingreso neto derivado por una corporación extranjera residente sujeta a contribución sobre ingresos federal bajo la Sección 936 del Código de Rentas Internas Federal, según enmendado (denominada de aquí en adelante como "corporación de las posesiones")

---

[25] Dicha disposición legal provee lo siguiente:

(g) *Contribuyentes que tienen en vigor una elección bajo la sec. 936 del Código de Rentas Internas Federal de 1986*. — El Secretario podrá reglamentar disposiciones especiales para la determinación del ingreso neto de un contribuyente que tenga en vigor una elección bajo la sec. 936 del Código de Rentas Internas de 1986, según enmendado.

de la explotación activa de una industria o negocio en Puerto Rico, será igual al ingreso neto computado por la corporación de las posesiones bajo el apartado (h) de la referida Sección 936….

Así pues, el Departamento de Hacienda asumió una posición que complementaba el método de *profit split* para efectos del cálculo de impuestos sobre ingresos derivados en Puerto Rico por una empresa 936.

Por otro lado, el efecto que la Sección 936(h) tuvo sobre el cálculo de patentes municipales siguió otro curso. Bajo la Ley de Patentes Municipales, las patentes se calculan a base del volumen de negocio atribuible a operaciones en el municipio que impone la patente autorizada. 21 L.P.R.A. sec. 651d(b) (2005). La Ley de Patentes Municipales define el volumen de negocios como "los ingresos brutos que se reciben o se devenguen por la prestación de cualquier servicio, por la venta de cualquier bien, o por cualquier otra industria o negocio en el municipio donde la casa principal realiza sus operaciones…". 21 L.P.R.A. sec. 651a(a)(7)(A)(i) (2005). Añade que ingresos brutos significa "la totalidad de los ingresos de fuentes dentro y fuera de Puerto Rico que sean atribuibles a la operación que se lleva a cabo en cada municipio…". 21 L.P.R.A. sec. 651a(a)(7)(A)(ii) (2005). Además, define el concepto de "atribuibles a la operación" como "la totalidad de los ingresos derivados dentro y fuera de Puerto Rico que reciba o devengue una persona

relacionada con la explotación de una industria o negocio en Puerto Rico…". 21 L.P.R.A. sec. 651a(a)(15) (2005).

En contraste con los ajustes que se hicieron a las contribuciones sobre ingresos, el cálculo de las patentes municipales para las empresas 936 no se alteró, por lo menos inicialmente, ni estatutariamente, ni por la vía reglamentaria en vista de la Sección 936(h). Sin embargo, en ocasiones, la OECI estipulaba mediante los decretos de exención contributiva otorgados bajo su ámbito, que el volumen de ingresos para propósitos de patentes municipales sería el cincuenta por ciento (50%) de los ingresos, esto en armonía con el método de *profit split*. Así, por ejemplo, el 4 de octubre de 1989 el decreto de exención contributiva original de Pepsi se enmendó para proveer que sus patentes municipales se calcularían a base de la mitad de su volumen de negocio.

No fue hasta el año 1991, casi una década después de adoptada la fórmula de *profit split* bajo el Código Federal de Rentas Internas, que se enmendó la Ley de Patentes Municipales a través de la Ley Núm. 82-1991 (1991 Leyes de Puerto Rico 676) (Ley 82),[26] para eximir del pago de patentes municipales "[l]os ingresos, no atribuibles a operaciones en Puerto Rico, de corporaciones exentas bajo

---

[26] La Ley Núm. 82-1991 (1991 Leyes de Puerto Rico 676) enmendó las Secciones 2, 4, 5, 7, 9, 10, 11, 13, 14 y 52 de la Ley Núm. 113 de 10 de julio de 1974, según enmendada, conocida como Ley de Patentes Municipales, 21 L.P.R.A. sec. 651 *et seq*. (2005). No obstante, en esta Opinión haremos referencia únicamente al Artículo 5, el cual agrega la Sección 9(27) a la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651h(27) (2005).

las secs. 10038 et seq. del Título 13, y leyes de incentivos industriales anteriores, de conformidad con las disposiciones de las Secciones 936 y 482 del Código Federal de Rentas Internas". 21 L.P.R.A. sec. 651h(27) (2005). En otras palabras, una empresa 936 que gozase de una exención contributiva otorgada bajo la Ley de Incentivos Contributivos de 1987 o alguna ley de incentivos industriales anterior, y que a la misma vez estuviese acogida a la elección de *profit split* bajo la Sección 936, quedaba exenta de pagar patentes municipales sobre el cincuenta por ciento (50%) de sus ingresos, ya que conforme el Código Federal de Rentas Internas esa mitad de sus ingresos se le imputaba a la compañía matriz no ubicada en Puerto Rico y no era, por tanto, atribuible a operaciones en la Isla. En términos prácticos, esta exención redujo el volumen de negocios que servía como base para calcular las patentes municipales a la mitad.

## C. Interpretación de la Ley

En el caso de autos, Pepsi era una empresa 936 acogida a la elección de *profit split* bajo el Código Federal de Rentas Internas y, a partir del 3 de febrero de 2000, gozaba de un nuevo decreto de exención contributiva otorgado bajo la Ley de Incentivos Contributivos de 1998. Es menester señalar que el nuevo decreto carecía de instrucción alguna en cuanto a cómo se computaría el volumen de negocio de Pepsi para efectos de calcular sus

patentes municipales. A pesar de esa omisión en el nuevo decreto, Pepsi y el Estado plantean que bajo el estado de derecho entonces vigente, la compañía actuó correctamente al rendir sus patentes municipales correspondientes a los años 2000 al 2004 conforme la exención provista por la Ley 82.

El Municipio refuta esa interpretación de la Ley 82 y argumenta que la misma ley claramente dispone que la exención sólo beneficia a aquellas empresas exentas bajo la Ley de Incentivos Contributivos de 1987 y leyes de incentivos contributivos anteriores. Alega que, dado que el nuevo decreto de Pepsi se dio en virtud de la Ley de Incentivos Contributivos de 1998, la cual no está contemplada en la Ley 82, la compañía no estaba cobijada por la exención alegada y no podía eximir el cincuenta por ciento (50%) de sus ingresos a la hora de calcular sus patentes municipales. Por tanto, el Municipio aduce que proceden las deficiencias notificadas.

En respuesta, Pepsi alega que la verdadera intención de la Ley 82 era establecer no sólo una exención, sino un método uniforme para que las corporaciones acogidas a la elección de *profit Split,* bajo la Sección 936, calcularan sus patentes municipales en Puerto Rico. Por otro lado, Pepsi también razona, junto con el Estado, que la Ley 82 no podía incluir expresamente la Ley de Incentivos Contributivos de 1998 por el simple hecho de que esta

última todavía no existía. No obstante, dada su similitud a la Ley de Incentivos Contributivos de 1987, la exención de patentes municipales debe extenderse naturalmente y por analogía. De otra forma, se incumpliría con la exposición de motivos de la Ley de Incentivos Contributivos de 1998. En apoyo a su argumento, Pepsi y el Estado señalan, además, que en vista de la Ley 82, era innecesario especificar en el nuevo decreto que se calcularían las patentes municipales a base del cincuenta por ciento (50%) del volumen de negocio conforme el método de *profit split*, como se hizo en el decreto anterior. Por consiguiente, la enmienda solicitada para el nuevo decreto no fue más que una gestión aclaratoria y las deficiencias son improcedentes.

Nos enfrentamos, entonces, con la tarea inherente de todo tribunal de interpretar la ley objeto de esta controversia para determinar el alcance de la exención de patentes municipales bajo la Ley 82, es decir, si cobija o no a Pepsi. Comenzamos este análisis hermenéutico con el principio de que una interpretación integral de una ley "consiste en auscultar, averiguar, precisar y determinar cuál era la voluntad legislativa al aprobar la ley". Ifco Recycling, Inc. v. Autoridad de Desperdicios Sólidos, 2012 T.S.P.R. 35, ___ D.P.R. ___ (2012), citando R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e Interpretación de las*

*Leyes de Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 241.

El primer paso en este proceso es leer y examinar el propio lenguaje de la ley. R.E. Bernier y J.A. Cuevas Segarra, op. cit. pág. 275. Es norma bien asentada que la letra clara de una ley reina. De este modo, el Artículo 14 del Código Civil dispone que "[c]uando la ley es clara libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". 31 L.P.R.A. sec. 14 (1993). Sin embargo, "[d]ebe rechazarse la aplicación estrecha, literal y mecánica de la ley sin atender a las razones que motivaron su aprobación y a los hechos a los cuales la norma ha de aplicarse. No debe frustrarse el propósito del estatuto interpretándolo al pi[e] de la letra." R.E. Bernier y J.A. Cuevas Segarra, op. cit. pág. 277. Véase Consejo Titulares v. DACo, 181 D.P.R. 945, 959 (2011).

Acorde con lo anterior, hemos resuelto que aunque la ley sea clara, eso no elimina el ejercicio jurídico de este Tribunal de tener que interpretarla. Ifco Recycling, Inc. v. Autoridad de Desperdicios Sólidos, *supra*, pág. 29; Consejo Titulares v. DACo, *supra*, pág. 958. Para llegar a una conclusión fiel a la verdadera intención de la Asamblea Legislativa, precisamos adentrarnos en su desarrollo historial. Consejo Titulares v. DACo, *supra*, págs. 960-961. Como explicamos en el caso de Orsini

García v. Srio. de Hacienda,[27] "nadie puede comprender e interpretar la significación de cualquier legislación con la mera lectura de su texto, sin conocer el contexto histórico, cultural y social en el cual se aprobó". Esto requiere la consideración de varios factores que acompañan la ley, incluyendo su exposición de motivos, la política pública del tiempo, los informes de las comisiones legislativas y el diario de sesiones, entre otros. Íd. Véase R.E. Bernier y J.A. Cuevas Segarra, op. cit. págs. 242-243.

Por último, en lo que concierne a la interpretación de exenciones contributivas, nuestra jurisprudencia sirve de guía útil. En el caso de los estatutos contributivos hemos expresado que éstos no se interpretarán de forma extensiva, sino de una forma justa, para cumplir con sus propios y expresos términos. Asimismo, deberán interpretarse a favor de la no imposición de la contribución cuando de éstos no surge claramente el propósito de imponerla. Pfizer Pharm. v. Mun. de Vega Baja, 182 D.P.R. 267, 279 (2011); Ifco Recycling, Inc. v. Autoridad de Desperdicios Sólidos, supra. En ese último caso citamos a Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548, 559-560 (2001), donde expresamos que "las exenciones contributivas, por ser privilegios excepcionales que concede el Estado, no deben extenderse

---

[27]    177 D.P.R. 596, 612 (2009).

más allá de los términos expresos y exactos del estatuto que las otorga y toda duda debe resolverse en contra de la existencia de la exención…". Véase Interior Developers v. Mun. de San Juan, *supra*, pág. 707. No obstante, también hemos establecido la norma de que las exenciones contributivas no deben ser interpretadas restrictivamente si ello derrotaría la intención legislativa. Pfizer Pharm. v. Mun. de Vega Baja, *supra*; Orsini García v. Srio. de Hacienda, *supra*, pág. 616; Textile Dye Works, Inc. v. Srio. de Hacienda, 95 D.P.R. 708, 713 (1968).

Discutidos estos preceptos, pasamos a interpretar la Ley 82 y la exención contributiva ahí establecida.

## D. El alcance de la Ley 82

La Ley 82 se originó con el Proyecto de la Cámara 1302. Iniciado el 26 de abril de 1991, el Diario de Sesiones correspondiente revela que el proyecto de ley original no incluía una exención de patentes municipales para los ingresos no atribuibles a operaciones en Puerto Rico conforme la Sección 936 del Código Federal de Rentas Internas. Más bien, su enfoque principal fue enmendar la Ley de Patentes Municipales para agilizar el mejor manejo y lograr el mayor cobro de patentes, ya que éstas representaban la segunda fuente de ingresos municipales. La Comisión de Asuntos Municipales no recibió la recomendación de incluir la exención objeto del presente caso hasta junio de ese año, después de que el Secretario

de Hacienda y la Asociación de Industriales de Puerto Rico tuvieron la oportunidad de ofrecer sus respectivas reacciones al proyecto de ley. El Informe del Secretario de Hacienda expresó:

> [B]ajo el programa de incentivos industriales de Puerto Rico opera un gran número de las llamadas "corporaciones 936". El ingreso de las corporaciones 936 está sujeto a ciertos cómputos y ajustes que se hacen bajo las Secciones 482 y 936 del Código Federal de Rentas Internas, los cuales nuestro Departamento reconoce otorgándole un tratamiento correlativo para propósitos de contribución sobre ingresos. *Es enteramente apropiado que estas peculiaridades del cómputo del ingreso de las corporaciones 936 sean también reconocidas para propósitos de patente municipal.* El Departamento, por tanto, sugiere se añada el siguiente párrafo a la enumeración de partidas exentas de la Sección 9 de la Ley:
>
>> En el caso de corporaciones exentas bajo la Ley. Núm. 8 del 24 de enero de 1987, según enmendada, <u>y leyes de incentivos industriales anteriores y subsiguientes</u>, los ingresos no atribuibles a las mismas de conformidad con las disposiciones de las Secciones 936 y/o 482 del Código Federal de Rentas Internas de 1986.

Informe del Proyecto de la Cámara 1302 suscrito por el Secretario de Hacienda el 5 de junio de 1991 (énfasis nuestro). La Asociación de Industriales de Puerto Rico reiteró el mismo mensaje y reprodujo la misma redacción para la exención en su memorando dirigido a la Comisión.

Por otro lado, en el Senado, la Administración de Fomento Económico sometió un informe escrito a la Comisión de Desarrollo Socio-Económico de Corporaciones y Municipios sobre el Proyecto del Senado 1056, también

correspondiente a la Ley 82. Advirtió que "las enmiendas aquí propuestas no deben afectar adversamente nuestro programa de fomento o desarrollo industrial, el cual es de vital importancia para el Pueblo de Puerto Rico y para los propios municipios en general". Informe del Administrador de la Administración de Fomento Económico con relación al Proyecto del Senado 1056 de 28 de mayo de 1991.

Indicó, además, lo siguiente:

[D]ebemos asegurarnos de que las enmiendas propuestas estén conforme a nuestro programa de fomento industrial para así poder mantener nuestra credibilidad como un gobierno de leyes, serio y responsable. No podemos atraer industrias a Puerto Rico ofreciéndoles unos incentivos y beneficios garantizados por decretos contractuales y luego de que estén en Puerto Rico, cambiar las reglas de juego mediante legislación o por interpretaciones agresivas con el afán de cobrar más contribuciones a la industria.

Es por esta razón que nuestras recomendaciones conllevan el objetivo de que se aclare el estado de derecho actual y no el de crear un nuevo estado de derecho.

(Énfasis omitido).

Partiendo de ese punto de vista, la Administración de Fomento Económico recomendó que se añadiera el siguiente párrafo a las exenciones de patentes municipales ya reconocidas en la Ley de Patentes Municipales:

Los ingresos no atribuibles a corporaciones exentas bajo la Ley Núm. 8 del 24 de enero de 1987, según enmendada, y leyes de incentivos industriales anteriores, de conformidad con las disposiciones de las secciones 936 y/o 482 del Código Federal de Rentas Internas de 1986.

(Comillas omitidas).

En su explicación para dicha sugerencia, ofreció como propósito lo siguiente:

> [R]econocer y honrar los ajustes de contabilidad que se hacen bajo las secciones 936 y 482 para determinar qué ingresos corresponden a las corporaciones 936 haciendo negocios en Puerto Rico. El Departamento de Hacienda, en consideración a la seriedad de estos ajustes, ha reconocido y honrado los mismos desde un principio, por lo tanto, *resulta razonable, necesario y conveniente para fines de claridad, que también estén reconocidos como exentos para propósitos del pago de patente municipal.*
>
> Como cuestión de hecho, [el apartado] tiene[] el *objetivo de establecer la situación de derecho existente para que quede meridianamente claro que tales eventos están exentos del pago de patente municipal.* Por consiguiente,… no tiene[] impacto económico adverso a los municipios ya que dichos eventos están exentos de tributación.

(Énfasis nuestro).

De primera impresión, y en vista del propósito de cumplir con los ajustes de contabilidad que requiere la Sección 936, uno supondría que la exención sugerida aplicaría a toda empresa 936 que pague patentes municipales en Puerto Rico, esto sin importar bajo qué ley de incentivos contributivos advino exenta. Sin embargo, en contraste con las recomendaciones del Secretario de Hacienda y la Asociación de Industriales de Puerto Rico, la Administración de Fomento Económico redactó su versión de la exención sin disponer qué ocurriría en cuanto a la exención en situaciones futuras, esto es, una vez que la Ley de Incentivos Contributivos del 1987 terminara de regir.

El 8 de agosto de 1991, la exención sugerida en los varios informes antes mencionados fue acogida en el borrador del Proyecto de la Cámara 1302, el cual en su Sección 9 disponía:

Se exime del pago de patentes impuestas por autorización de esta ley a:

….

(27) Los ingresos, no atribu[i]bles a operaciones en Puerto Rico, de corporaciones exentas bajo la Ley Núm. 8 de 24 de enero de 1987, según enmendada y leyes de incentivos industriales anteriores, de conformidad con las disposiciones de las Secciones 936 y 482 del Código de Rentas Internas Federal.

Del récord legislativo no se desprende discusión alguna sobre el efecto o propósito buscado con esta exención en particular, ni una explicación del por qué la versión finalmente incorporada al proyecto de ley no dispuso para su aplicación prospectiva.

Lo significante, sin embargo, es que los legisladores tuvieron ante sí dos (2) variaciones de la misma exención – una claramente más amplia que la otra – y aprobaron la segunda. Esta decisión legislativa merece reconocimiento y gran respeto, pues al escoger la segunda versión no queda duda de que la intención fue formular una exención de patentes municipales sujeta a ciertos límites internos. En este caso, la construcción clara y precisa de la Ley 82 ciñe la disponibilidad de la exención a corporaciones 936 exentas bajo la Ley de Incentivos Contributivos de 1987 o leyes semejantes anteriores.

En <u>Nieves Cruz v. U.P.R.</u>, 151 D.P.R. 150, 160 (2000), enfrentamos una situación análoga. En ese caso tuvimos que determinar si una ley tenía efecto retroactivo aunque, de su faz, guardaba silencio a tal respecto. Observamos que durante el proceso de aprobación de la ley, hubo testimonio a favor de su retroactividad en las vistas públicas. No obstante, resolvimos que de existir una intención legislativa a tales efectos, lo lógico hubiera sido incluir las palabras necesarias en el texto de la ley para expresar dicha intención. Al no hacerlo, entendimos que los legisladores optaron por no brindarle carácter retroactivo al estatuto. Como corolario, en el caso de autos, al no incorporar la cláusula "y bajo leyes de incentivos contributivos subsiguientes" a la exención, aunque se sugirió en varios informes, lo lógico es concluir que los legisladores no quisieron decretar una exención tan expansiva.

Del contexto más amplio de la Ley 82, tampoco encontramos justificación para extender sus términos por analogía a corporaciones que advinieron exentas bajo leyes de incentivos contributivos posteriores al año 1987. Tanto su Exposición de Motivos como el debate que transcurrió en el hemiciclo, pusieron hincapié sobre el fin general que perseguía la reforma municipal de facilitar una mayor autonomía y base fiscal para los municipios. No es difícil percibir cómo una exención de

patentes del cincuenta por ciento (50%) de los ingresos de las empresas 936 detraería de dicho propósito estatutario.

Además, conforme Ifco Recycling, Inc. v. Autoridad de Desperdicios Sólidos, *supra*, y los casos ahí citados, nuestra implantación de las exenciones contributivas debe marcar un equilibrio entre una interpretación restrictiva del estatuto que a la vez cumple cabalmente con los términos y el propósito del privilegio tributario.

El planteamiento de Pepsi de que no se incluyó la Ley de Incentivos Contributivos de 1998 expresamente en la Ley 82 porque para aquel entonces todavía no existía es inmeritorio y poco convincente. Desde el año 1954 las leyes de incentivos contributivos se han aprobado sujetas a sus respectivas fechas de vigencia o expiración.[28] La Legislatura tenía pleno conocimiento de que la Ley de Incentivos Contributivos de 1987 sólo tendría efecto hasta el año 1997. 13 L.P.R.A. sec. 10038 n. (2007), hoy derogada. Al especificar que la exención aplicaría a corporaciones exentas bajo ésta y leyes anteriores, se marcó un punto después del cual obraría un trato diferente para los ingresos de una empresa 936 no atribuibles a

---

[28] Véase la Ley de Incentivo Industrial de Puerto Rico de 1954, 13 L.P.R.A. sec. 10001 *et seq.*, hoy derogada (vigente hasta el 31 de diciembre de 1963); Ley de Incentivo Industrial de Puerto Rico de 1963, 13 L.P.R.A. sec. 10012 *et seq.*, hoy derogada (vigente hasta el 30 de junio de 1983); Ley de Incentivos Industriales de 1978, 13 L.P.R.A. sec. 10024 *et seq.*, hoy derogada (vigente hasta el 30 de junio de 1988); Ley de Incentivos Contributivos de 1987, 13 L.P.R.A. sec. 10038 *et seq.*, hoy derogada (vigente hasta el 31 de diciembre de 1997); Ley de Incentivos Contributivos de 1998, 13 L.P.R.A. sec. 10101 *et seq.*, hoy derogada (vigente hasta el 31 de diciembre de 2007). En el año 2008, sin embargo, entró en vigor la Ley de Incentivos Económicos para el Desarrollo de Puerto Rico, 13 L.P.R.A. sec. 10641 *et seq.* (Supl. 2011), sin fecha límite alguna.

operaciones en Puerto Rico según la Sección 936. El hecho de que la Ley de Incentivos Contributivos de 1987 venciera en una fecha exacta ampara nuestro razonamiento de que la intención legislativa no fue otorgar una exención de patentes municipales para corporaciones cobijadas bajo *cualquier* estatuto de incentivos contributivos.

En vista de todo lo anterior, es forzoso concluir que la exención de patentes municipales aprobada en la Ley 82, y recogida en la Sección 9(27) de la Ley de Patentes Municipales, no es de aplicación beneficiosa a corporaciones 936 exentas bajo leyes de incentivos industriales subsiguientes al año 1987. Por tanto, Pepsi no cualificaba para dicha exención bajo el estado de derecho entonces vigente, aunque sí lo adquirió posteriormente conforme la enmienda a su decreto de exenciones contributivas aprobado por la OECI, como explicaremos más adelante.

Entendemos que nuestra decisión implica un resultado que vulnera algunos de los motivos que impulsaron la Ley de Incentivos Contributivos de 1998, tales como fortalecer la base industrial de la Isla y fomentar un mayor empleo al reducir los costos de hacer negocios en Puerto Rico. Exposición de Motivos de la Ley Núm. 135-1997 (1997 Leyes de Puerto Rico 636). Al no eximir los ingresos no atribuibles a operaciones en Puerto Rico conforme el método de *profit split* del pago de patentes municipales

para las corporaciones 936, exentas bajo la Ley de Incentivos Contributivos de 1998 y leyes posteriores, éstas pudieran enfrentar una doble tributación sobre esos fondos; una bajo el Código Federal de Rentas Internas a través de sus afiliadas en los Estados Unidos, y otra en la modalidad de patentes municipales. En situaciones como la de Pepsi, donde una compañía fabricante que anteriormente gozaba de esta exención de patentes municipales, pero que le fue eliminada al renovar su decreto bajo las leyes contributivas más recientes, este costo adicional inesperado ciertamente no es acogido. A la larga, esto podría causar el abandono de muchas empresas estadounidenses de la Isla y la eliminación de un sector importante de empleo.

No obstante estas serias preocupaciones, "*no* es función de este [T]ribunal corregir las deficiencias que encuentre en una legislación sometida a su estudio e interpretación. Lo único que podemos hacer es señalar esas deficiencias, para que ellas sean corregidas por el Poder Legislativo". First Bank de P.R. v. Mun. de Aguadilla, 153 D.P.R. 198, 207-208 (2001) (énfasis en original y comillas omitidas) (citando The Texas Co. v. Domenech, Tes., 50 D.P.R. 432, 451 (1936)). Después de todo, "[l]a función del Tribunal Supremo es interpretar la ley, sin juzgar su bondad o sabiduría". R.E. Bernier y J.A. Cuevas Segarra, op. cit. pág. 243.

**III**

En vista de la notificación inicial de las deficiencias, Pepsi le solicitó a la OECI una enmienda a su decreto para que especificara que el volumen de negocios fuera calculado a base de la mitad de sus ingresos conforme el método de *profit split*. Aunque el Municipio conocía que la OECI estaba considerando dicha enmienda e inclusive participó en varias ocasiones en el proceso de consideración, emitió su notificación final de las deficiencias antes de que la OECI resolviera la solicitud. Unos meses después, la OECI otorgó la enmienda con efecto retroactivo a la fecha de comienzo del decreto. De esta manera, según alegan Pepsi y el Estado, las deficiencias se tornaron en improcedentes. Nos toca determinar la validez de la enmienda al decreto de Pepsi impugnada por el Municipio.

Como cuestión de umbral, analizaremos si el Municipio tiene legitimación activa para oponerse a la enmienda.

**A. Legitimación activa del Municipio para impugnar la enmienda al decreto otorgado por la OECI**

Como es bien sabido, la revisión judicial de una acción administrativa se presume, a menos que la legislatura lo haya prohibido expresamente. Federación v. Molina, 160 D.P.R. 571, 583 n. 16 (2003); Bonilla v. Chardón, 118 D.P.R. 599, 609 (1987); Demetrio Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento*

*Administrativo Uniforme*, Forum, 2da ed. 2001, sec. 8.2, pág. 420.

En el caso de la Ley de Incentivos Contributivos de 1998, no hay duda de que, efectivamente, se restringió dicha facultad a los tribunales. La ley claramente estableció que "[t]odas las decisiones y determinaciones del Secretario de Estado bajo esta parte serán finales y contra las mismas no procederá revisión judicial o administrativa u otro recurso, a menos que específicamente se disponga otra cosa". 13 L.P.R.A. sec. 10114(a) (2007).

En Pfizer Pharm. v. Mun. de Vega Baja, *supra*, pág. 293, esbozamos que esta disposición estatutaria, junto con la condición de contrato que la ley le brindó a los decretos, ciertamente sirvió para promover la seguridad y confianza de las corporaciones estadounidenses y extranjeras que trasladaron sus negocios a Puerto Rico incentivados por el favorable sistema contributivo.

No obstante, a tenor con el mandato legislativo, si bien es cierto que "[n]o le compete a los tribunales pasar juicio sobre la sabiduría" de las determinaciones del Secretario de Estado de conferir o no una exención contributiva, Pfizer Pharm. v. Mun. de Vega Baja, *supra*, pág. 294, esto no inmuniza por completo a los decretos que se aprobaron bajo la Ley de Incentivos Contributivos de 1998 de revisión en los foros judiciales.

Es norma bien asentada que aunque una ley elimine la oportunidad de revisión de una actuación administrativa, si se menoscaban los derechos constitucionales o estatutarios de una parte, no se puede impedir el acceso de ésta a los tribunales. Pfizer Pharm. v. Mun. de Vega Baja, *supra*, pág. 282; D. Fernández Quiñones, op. cit. pág. 420. Otra ocasión en la que se puede rechazar u obviar una prohibición legislativa de revisión judicial es cuando una agencia haya actuado de manera *ultra vires* y en contravención de su ley orgánica. D. Fernández Quiñones, op. cit. pág. 421.

En el caso de autos, el Municipio impugna la decisión de la OECI, aprobada por el Secretario de Estado, de enmendar la exención contributiva de Pepsi por dos (2) razones. Primero, el Municipio entiende que la OECI sólo tiene facultad legal para eximir a Pepsi de un sesenta por ciento (60%) de sus patentes municipales, y que no puede determinar cuál será el volumen de negocios de una empresa para propósitos de calcular sus patentes municipales. Según el Municipio, eso es un término que la Ley de Incentivos Contributivos de 1998 no contempla y tampoco se le ha delegado a la OECI. Segundo, sostiene que la OECI carece de facultad para conceder una enmienda con efecto retroactivo al decreto de exención contributiva de Pepsi. Alega que la OECI se excedió de sus poderes delegados por

la Ley de Incentivos Contributivos de 1998 al ordenar que se enmendara el decreto de esa manera.

Nos compete aclarar que existe una diferencia significativa entre impugnar la decisión de una agencia por estar en desacuerdo con sus méritos, y alegar que la decisión es nula por constituir un acto *ultra vires*. La posición del Municipio cae bajo la segunda categoría. No se cuestiona la determinación de la OECI de autorizar una exención contributiva a favor de Pepsi por entender que no promueve los intereses de la Isla o constituye un abuso de discreción, sino que se alega que la enmienda es *per sé* nula porque la concesión constituye un acto *ultra vires*. El Tribunal de Primera Instancia no apreció esta diferencia al determinar que no le correspondía pasar juicio sobre la enmienda. Ciertamente, no tenía autoridad para sopesar los méritos de la enmienda, pero sí podía determinar si, como cuestión de derecho, la OECI actuó dentro del marco de su autoridad delegada por ley.

Por consiguiente, resolvemos que el Municipio sí tiene legitimación activa para presentar su *Demanda Contra Tercero* interpuesta contra el Estado. Ahora determinaremos si le asiste la razón en lo atinente a su impugnación de la exención en controversia.

**B. Validez de la enmienda al decreto**

Los argumentos del Municipio traen a colación dos (2) aspectos de la enmienda que requieren análisis: (1) si la

OECI tenía la facultad para incluir una cláusula en su decreto estableciendo cuál sería el volumen de negocios para efectos de calcular patentes municipales, y (2) si tenía la facultad de conceder una enmienda con carácter retroactivo.

**(1) La OECI podía modificar la Ley de Patentes Municipales mediante un decreto de exención contributiva**

Aunque la Asamblea Legislativa les ha delegado un poder tributario a los municipios para brindarle un mayor grado de autonomía fiscal, éstos están sujetos a las leyes y restricciones que regulan dicha potestad. Pfizer Pharm. v. Mun. de Vega Baja, *supra*, págs. 286-287. Como limitación de este poder, los municipios no pueden imponer contribuciones sobre los ingresos que el Gobierno haya designado exento. Íd. págs. 287-288. La Ley de Incentivos Contributivos de 1998, al igual que sus antecedentes y la ley que luego la remplazó, modificaron la facultad impositiva de los municipios al proveer para la otorgación de decretos de exención contributiva a través de la OECI. Íd. págs. 287-289. Este Tribunal ha reconocido que estos decretos son instrumentos esenciales para la promoción del programa de incentivos industriales de Puerto Rico y el desarrollo económico de la Isla. Íd. págs. 279-280; Textile Dye Works, Inc. v. Srio. de Hacienda, *supra*, pág. 713.

Los negocios que recibieron decretos bajo la Ley de Incentivos Contributivos de 1998 gozaron de algunos términos uniformes que se adoptaron legislativamente, tal como una exención de sesenta por ciento (60%) sobre las patentes municipales, arbitrios municipales y otras contribuciones municipales impuestas por ordenanza. 13 L.P.R.A. sec. 10105(b)(1) (2007). Por otro lado, la Ley de Incentivos Contributivos de 1998 también dispuso que los decretos:

> se considerarán de la naturaleza de un contrato entre el concesionario, sus accionistas, socios o dueños y el Gobierno de Puerto Rico, e incluirán aquellos términos y condiciones que sean consistentes con el propósito de esta parte y que promuevan la creación de empleos mediante el desarrollo social y económico de Puerto Rico, tomándose en consideración la naturaleza de la petición o acción solicitada, así como los hechos y circunstancias relacionadas de cada caso en particular que puedan ser de aplicación.

13 L.P.R.A. sec. 10112(f) (2007).

No todos los decretos son iguales, ya que cada negocio solicitante tiene sus preocupaciones y necesidades particulares. Por cierto, "cada Decreto es único y su negociación ha conllevado un estricto análisis de la solicitud y las circunstancias particulares de los contratantes". Pfizer Pharm. v. Mun. de Vega Baja, *supra*, pág. 283. No obstante, los términos específicos de cada decreto individual obligan a los municipios de la misma manera que aquéllos deletreados en el texto de la Ley de Incentivos Contributivos de 1998.

Recientemente reconocimos este hecho en <u>Pfizer Pharm.</u> <u>v. Mun. de Vega Baja</u>, *supra*, donde la controversia giraba en torno a cómo se debería tributar unos intereses recibidos por Pfizer devengados de préstamos realizados a favor de corporaciones extranjeras no dedicadas a industria en Puerto Rico. El decreto de Pfizer objeto de ese caso, otorgado bajo la Ley de Incentivos Contributivos de 1998, disponía que los ingresos de fuentes de fuera de Puerto Rico se considerarían ingresos de fomento industrial, sujetos a la tasa fija provista y exentos en un sesenta por ciento (60%) del pago de patentes municipales. <u>Íd.</u> pág. 273. Resolvimos que, aunque los ingresos no serían tributables de forma alguna conforme las leyes contributivas entonces en efecto, los términos del decreto facultaron al Municipio de Vega Baja a imponer el pago de patentes sobre los intereses. <u>Íd.</u> pág. 292. Rechazamos el argumento del Municipio de Vega Baja – también planteado por el Municipio de Cidra en el caso de autos – de que la OECI no podía conceder una exención que no estaba expresamente especificada en el estatuto por medio de un decreto. <u>Íd.</u> págs. 292-293. Al analizar la Ley de Incentivos Contributivos de 1998, notamos que "la Asamblea Legislativa ha creado un procedimiento que otorga gran discreción al funcionario contratante para aceptar ofertas o requerir condiciones que redunden en los mejores

intereses económicos y sociales de nuestra Isla". Íd. pág. 293.

Así pues, los decretos de exenciones contributivas, compuestos tanto por las condiciones impartidas por la Ley de Incentivos Contributivos de 1998 como los términos particulares a cada negocio, representan una limitación adicional al poder de los municipios de imponer patentes municipales sobre los ingresos devengados por negocios dentro de su demarcación geográfica. Teniendo en cuenta su naturaleza de contrato, éstos tienen fuerza de ley supletoria que vinculan a los municipios a la hora de ejercer su delegada facultad tributaria. Véase Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994 (1990).

En el caso de autos, la enmienda al decreto de Pepsi modificó significativamente el método para cuantificar el volumen de negocios sujeto a patentes municipales establecido en la Ley de Patentes Municipales, al ordenar que el mismo se redujera por la mitad. No obstante, acorde lo anterior, si el Secretario de Estado determinó que incorporar el concepto de *profit split* al cálculo de patentes municipales fomentaba un mayor desarrollo socioeconómico, tenía la potestad de hacerlo. En cuanto a esa determinación, no nos compete revisar o cuestionarla. 13 L.P.R.A. sec. 10114(a) (2007). El hecho de que la OECI acordó un estándar distinto al que se encuentra en la Ley de Patentes Municipales, y que éste no emana del texto

explícito de la Ley de Incentivos Contributivos de 1998, no derrota la validez del decreto.

**(2) La OECI podía enmendar un decreto retroactivamente para reflejar el intento inicial de las partes**

No hay duda de que la Ley de Incentivos Contributivos de 1998 autoriza a la OECI a enmendar las concesiones que haya aprobado. 13 L.P.R.A. sec. 10112 (2007). En el caso de recibir una solicitud de enmienda, el procedimiento estatutario requiere que la OECI prepare un proyecto de decreto y lo circule a las agencias y municipios concernientes, entre otras entidades, para su evaluación económica y fiscal. 13 L.P.R.A. sec. 10112(j)(2) (2007). Éstos tendrán un periodo de veinte (20) días para someter un informe u opinión al Director de la OECI, quién podrá descansar en las recomendaciones ahí suministradas. 13 L.P.R.A. sec. 10112(j)(2), 10112(j)(4) (2007). Sin embargo, una lectura de la ley, así como su reglamento no arroja luz sobre si esta facultad incluye el poder de aprobar una enmienda *con efecto retroactivo* a la fecha en que comenzó a regir el decreto. Ésa es la interrogante planteada por el Municipio.

Por otro lado, como señalamos anteriormente, la Ley de Incentivos Contributivos de 1998 establece que las concesiones de exención contributiva constituyen un contrato entre el negocio recipiente del decreto y el Gobierno de Puerto Rico. 13 L.P.R.A. sec. 10112(f)

(2007). Por consiguiente, los decretos se regirán por las normas generales relativas a los contratos. Pfizer Pharm. v. Mun. de Vega Baja, *supra*, pág. 283; Qume Caribe, Inc. v. Srio. de Hacienda, 153 D.P.R. 700, 729 (2001).

Pasamos entonces a revisar las reglas que gobiernan todo contrato para determinar si las partes podían enmendar el decreto con efecto retroactivo, a los fines de esclarecerlo. El Código Civil pauta varias normas ilustrativas para este ejercicio. Comenzamos con el principio de la autonomía de voluntad de las partes enmarcado por el Artículo 1207 del Código Civil, el cual consagra cualquier pacto que sea conveniente, siempre que no sea contrario a la ley, moral u orden público. 31 L.P.R.A. sec. 3372 (1990). Pfizer Pharm. v. Mun. de Vega Baja, *supra*, pág. 283.

Ahora bien, el alcance de las obligaciones pactadas es una función directa de la intención de las partes. VDE Corporation v. F & R Contractors, 180 D.P.R. 21, 35 (2010). A tal efecto, el Artículo 1233 del Código Civil dispone que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas". 31 L.P.R.A. sec. 3471 (1990). Este artículo va a la par con el próximo, el cual prescribe lo siguiente: "Para juzgar

la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato." Art. 1234 del Código Civil, 31 L.P.R.A. sec. 3472 (1990). Se pueden tomar en consideración, además, los actos y las circunstancias anteriores a la otorgación del contrato que puedan indicar la voluntad de los contratantes. VDE Corporation v. F & R Contractors, *supra*, pág. 35; Unisys v. Ramallo Brothers, 128 D.P.R. 842, 853 (1991); Ramírez, Segal & Látimer v. Rojo Rigual, 123 D.P.R. 161, 174 (1989); Marina Ind., Inc. v. Brown Boveri Corp., 114 D.P.R. 64, 69-70 (1983) (citando Merle v. West Bend Co., 97 D.P.R. 403, 409-410 (1969)).

Volviendo al caso de autos, resumimos brevemente lo sucedido. El decreto original de Pepsi, otorgado en el año 1977, se enmendó en octubre del 1989 para especificar que, si estuviera acogida a la fórmula de *profit split*, sus patentes municipales se calcularían a base del cincuenta por ciento (50%) de su volumen de negocios. Dos (2) años más tarde, entró en vigor la Ley 82. Cuando Pepsi solicitó y recibió su nuevo decreto en el año 2000, éste nada disponía sobre el cómputo del volumen de negocios para efectos de patentes municipales. Sin embargo, Pepsi y el Estado alegan que siempre entendieron que seguiría rigiendo la exención sobre la mitad del volumen de negocios. Ambos asumieron, aunque

erróneamente, que la exención aprobada mediante la Ley 82 aplicaría a los decretos otorgados bajo la Ley de Incentivos Contributivos de 1998, eliminando así la necesidad de incluir dicho término en el decreto. No fue hasta que el Municipio le notificó a Pepsi de las deficiencias adeudadas que la empresa se percató de la necesidad de enmendar el decreto para que se aclarara la aplicación del criterio de *profit split* para efectos de sus patentes municipales. Cabe señalar que la enmienda solicitada siempre se designó como una medida de clarificación.[29]

En fin, el trato que la OECI le brindaba a Pepsi antes de la otorgación del decreto en controversia, las nuevas disposiciones estatutarias de la Ley de Patentes Municipales a través de la Ley 82, además de las manifestaciones de las partes obligadas por el decreto revelan la intención compartida por Pepsi y el Estado. Éstos siempre concibieron que se eximiera la mitad del volumen de negocio de Pepsi a la hora de ésta calcular sus patentes municipales. Aunque el decreto no lo expresó

---

[29] La carta suscrita por Pepsi solicitando la enmienda al decreto a la OECI expresa, en su parte pertinente, lo siguiente:

> The amendment is to clarify that Grantees have properly determined the taxable sales volume for purposes of the Municipal License Tax under the methodology provided by Section 936 of the U.S. Internal Revenue Code.

Luego, en su memorando a la OECI, Pepsi reiteró que la "solicitud persigue clarificar que el método a seguir los Peticionarios en la determinación de su volumen de negocios para efectos de determinar su responsabilidad de patente municipal está basado en el método que disponía el decreto anterior de los Peticionarios".

taxativamente, la intención prevalece sobre el instrumento redactado.

Partiendo de la premisa de que desde un principio fue implícitamente acordado entre las partes que se usaría el método de *profit split* para calcular las patentes municipales de Pepsi, la enmienda al decreto en esta ocasión no fue una sustantiva. No añadió nuevas exenciones contributivas otorgadas a favor de Pepsi, ni alteró las fechas en que las exenciones entrarían en efecto. No cabe duda de que el propósito primordial de la enmienda al decreto fue esclarecer para fines de los municipios, que el trato que Pepsi recibía anteriormente continuaría en efecto.[30]

El Municipio inmeritoriamente alega que es un tercero afectado por la aprobación de la enmienda y que al no dar su consentimiento, resulta inválida. Según dispone la Ley de Incentivos Contributivos de 1998, los municipios no son terceros, sino participantes en el proceso de aprobación de un decreto. Éstos tienen la oportunidad de brindarle a la OECI su recomendación desfavorable, de haberla. 13 L.P.R.A. sec. 10112(j)(2) (2007). No obstante, la misma ley dispone que el Director de la OECI no está obligado a obtener la aprobación de un municipio afectado para

---

[30] Por cierto, la Compañía de Fomento Industrial reconoció que el calcular sus patentes municipales conforme el método de *profit split*, tal como fijó su decreto original, formó una práctica operacional de Pepsi ("*an operational mechanism of their business*") y una ventaja de hacer negocios en Puerto Rico.

otorgar una exención contributiva. 13 L.P.R.A. sec. 10112(j)(4) (2007).

También diferimos de la conclusión del Tribunal de Apelaciones en cuanto a que no se podía enmendar el decreto de exención contributiva retroactivamente si ello tuviera el efecto de privar al Municipio de fondos que esperaba recibir. Si bien es cierto que la enmienda objeto de este recurso impacta al Municipio negativamente al reducir una fuente de sus fondos, los hechos revelan que el Municipio tenía pleno conocimiento de que el decreto se podía enmendar retroactivamente al 1 de julio de 2000 antes de haber concluido su revisión administrativa de las deficiencias preliminarmente notificadas. Es decir, antes de haber advenido final y firme su determinación de las insuficiencias en las patentes de Pepsi. El 14 de noviembre de 2005 Pepsi solicitó la enmienda al decreto ante la OECI. Dentro del mismo mes, el 29 de noviembre de 2005 el Municipio sometió su primera oposición a la enmienda. Sin embargo, el 14 de diciembre de 2005 confirmó la deficiencia notificada a Pepsi apresuradamente antes de finalizarse la determinación de la OECI en cuanto a la enmienda solicitada. No vemos con simpatía este tipo de acción prematura. El Municipio tenía conocimiento de la posibilidad de que su imposición de patentes no

prevaleciera si se aprobaba la enmienda, y asimismo ocurrió.

Por tanto, teniendo en cuenta las circunstancias del presente caso y el hecho de que las partes compartían la misma intención en cuanto a los términos que el decreto impartiría, la OECI no actuó de manera *ultra vires* al aprobar la enmienda aclaratoria retroactiva, la cual es válida.[31] Pepsi estaba autorizado a reducir el volumen de sus negocios en un cincuenta por ciento (50%) y computar sus patentes municipales sobre esa mitad. Luego, gozaba de una exención de sesenta por ciento (60%) sobre esa cantidad.

## IV

Por último, resta el asunto de si existe o no una controversia de hechos que amerite que el caso vaya a juicio, o si por el contrario, los planteamientos esgrimidos son aptos para resolverse por la vía sumaria.

La Regla 36.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36.3 (2001),[32] dispone que se dictará sentencia sumaria si de los documentos que obran en el expediente del tribunal, incluyendo específicamente las alegaciones,

---

[31] Como resultado, procedía la desestimación de la *Demanda Contra Tercero* instada por el Municipio.

[32] Hacemos referencia a las Reglas de Procedimiento Civil de 1979 por ser éstas las que estaban vigentes cuando se dictaron las sentencias recurridas. Sin embargo, el análisis sobre cuándo procede una sentencia sumaria sigue siendo el mismo bajo la Regla 36 de las Reglas de Procedimiento Civil de 2009, 32 L.P.R.A. Ap. V, R. 36 (2010). Szendrey v. Consejo de Titulares del Condominio Metropolitan Professional Park, 2011 T.S.P.R. 206, 184 D.P.R. _ (2011).

deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, y declaraciones juradas, de haberlas, se demostrase "que no hay controversia real sustancial en cuanto a ningún hecho material y que, como cuestión de derecho, debe dictarse sentencia sumaria a favor de la parte promovente". Mejías Montalvo, *et al.* v. Carrasquillo Martínez, *et al.*, 2012 T.S.P.R. 62, 185 D.P.R. _ (2012).

En innumerables ocasiones hemos definido un hecho material como aquél que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable. Mejías Montalvo, *et al.* v. Carrasquillo Martínez, *et al.*, *supra*; Szendrey v. Consejo de Titulares del Condominio Metropolitan Professional Park, 2011 T.S.P.R. 206, 184 D.P.R. _ (2011); Ramos Pérez v. Univisión, 178 D.P.R. 200, 213 (2010). Además, una controversia de hecho es suficiente para derrotar una moción de sentencia sumaria sólo cuando causa en el tribunal una duda real y sustancial sobre algún hecho relevante y pertinente. Szendrey v. Consejo de Titulares del Condominio Metropolitan Professional Park, *supra*; Córdova Dexter v. Sucn. Ferraiuoli, 182 D.P.R. 541, 556 (2011); Ramos Pérez v. Univisión, *supra*, pág. 214. De no existir dicha controversia, lo que resta es aplicar el derecho a los hechos establecidos, convirtiendo una vista en los méritos

en innecesaria. Vera v. Dr. Bravo, 161 D.P.R. 308, 334 (2004)."

Si bien es cierto que dentro del mecanismo de la sentencia sumaria rige el precepto reconocido de que toda inferencia que se haga de los hechos incontrovertidos debe hacerse a favor de la parte que se opone a la misma, Mejías Montalvo, *et al.* v. Carrasquillo Martínez, *et al.*, *supra*, la parte opositora a que se dicte sentencia sumaria no puede cruzarse de brazos y descansar en sus alegaciones. Córdova Dexter v. Sucn. Ferraiuoli, *supra*. Le corresponde refutar los hechos materiales que están en disputa mediante la presentación de evidencia sustancial. Szendrey v. Consejo de Titulares del Condominio Metropolitan Professional Park, *supra*; Córdova Dexter v. Sucn. Ferraiuoli, *supra*. "Esto es, la parte que se opone viene obligada a contestar de forma detallada y específica aquellos hechos pertinentes para demostrar que existe una controversia real y sustancial que debe dilucidarse en juicio." Ramos Pérez v. Univisión, *supra*, pág. 215.

Recientemente, en Szendrey v. Consejo de Titulares del Condominio Metropolitan Professional Park, *supra*, reiteramos las circunstancias bajo las cuales no se dictará sentencia sumaria. Éstas son cuando: (1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se

acompañan con la moción una controversia real sobre algún hecho material y esencial, o (4) como cuestión de derecho no procede. Íd.; Vera v. Dr. Bravo, *supra*, págs. 333-334. Véase, además, Ramos Pérez v. Univisión, *supra*, pág. 217.

Pasamos ahora a aplicar los criterios del marco legal antes descrito al caso de autos. El Municipio alega que existe una controversia de hechos materiales debido a que los ingresos informados por Pepsi en su planilla de patentes municipales por concepto de *profit split* no concuerdan con aquéllos informados al Departamento de Hacienda.[33] Según el Municipio, hay una diferencia ascendente a billones de dólares entre ambas. El Municipio deduce que la marcada discrepancia se debe a que Pepsi utilizaba un método o una interpretación de *profit split* distinta para computar sus patentes municipales y para calcular sus contribuciones sobre ingresos.

Cabe señalar que las cifras usadas por el Municipio en su comparación se derivaron de los estados financieros de Pepsi, los cuales dicha entidad acostumbraba incluir junto a sus planillas presentadas ante el Departamento de Hacienda. Específicamente, el Municipio se concentró en

---

[33] Notamos que el Municipio también identificó como hechos en controversia: (1) la forma en que se debía computar el volumen de negocio para determinar el pago de patentes municipales, es decir, si correspondía el método de *profit split* o la definición de la Ley de Patentes Municipales; y (2) la legalidad de la retroactividad del decreto de exención contributiva solicitado por Pepsi. Sin embargo, estas interrogantes son, más bien, controversias de derecho que no requieren la determinación de hecho alguno y que hoy hemos resuelto.

la línea denominada "*profit-split and cost-sharing allocations*" contenida en dichos estados financieros.

Pepsi, por su parte, refuta que las diferencias numéricas presentan una controversia de hechos material. Sostiene, además, que no son comparables las cantidades reportadas por ellos a ambos organismos gubernamentales por dos (2) razones. Primero, Pepsi indica que los números que el Municipio utilizó como "*profit split Hacienda*" no son los que realmente se informaron al Departamento de Hacienda, sino que provienen de las notas consignadas en el estado financiero de la empresa referente a transacciones entre compañías afiliadas ("*Related-Party Transactions*"). La Sra. Janice Franco Torres (señora Franco), Directora de Finanzas de Pepsi, testificó en su deposición, la cual nunca fue contradicha por el Municipio, que el estado financiero no contiene la información que Pepsi oficialmente reporta al Departamento de Hacienda, aunque admitió que voluntariamente envía este documento como anejo a las planillas de contribuciones sobre ingresos. Pepsi también nos trae a la atención que de acuerdo a estas notas, dicha cifra representa un concepto que se describió de la siguiente manera: "Significant transactions with related parties… in addition to those shown elsewhere in the financial statements…". Pepsi mantiene, entonces, que el Municipio creó una confusión de hechos innecesaria con sus

aseveraciones incorrectas al tratar de cualificar una nota al estado financiero de Pepsi como lo que se le reportó al Departamento de Hacienda.

Segundo, Pepsi explica el por qué los números del Departamento de Hacienda y el Municipio no tan sólo son distintos, sino incomparables. La señora Franco explicó que las diferencias entre los informes rendidos al Municipio y al Departamento de Hacienda se deben a que el primero sólo refleja las ventas, mientras que el segundo presenta los ingresos más los gastos.[34] Es decir, las partidas corresponden a conceptos diferentes. Por lo tanto, aunque la definición de *profit split* es la misma, la información a la que ha de aplicarse en cada planilla es distinta. Para efectos del Municipio, se reducen los ingresos brutos atribuibles a Cidra en un cincuenta por ciento (50%), mientras que para el Estado se reduce la mitad de los ingresos netos generados en Puerto Rico.

---

[34] El siguiente intercambio se dio entre el licenciado Hernández, representante del Municipio, quien hizo las preguntas, y la señora Franco, quien respondió:

P:   Esa es la pregunta, esa es la pregunta. ¿Por qué es la diferencia?
R:   En la patente municipal se presenta el 'profit split' como un cincuenta por ciento de las ventas.
P:   Unjú.
R:   En el estado financiero se está presentando el 'profit split' como una cantidad del efecto neto en los estados financieros.
P:   ¿Y a qué obedece eso?
R:   A que aquí se presentan ventas y aquí está el estado financiero, el estado de ingresos y gastos completo.

Lcdo. Torres: Para fines del registro, perdóneme, cuando dijo: "Aquí se presentan ventas", se refirió al documento sometido al Municipio y cuando dijo la otra explicación se refirió a las notas del estado financiero.

Deposición de la señora Franco, 21 de agosto de 2006, pág. 33.

Esta explicación de que las figuras representaban dos (2) conceptos diferentes se repitió en referencia a cada uno de los años investigados.

En reconsideración, el Tribunal de Apelaciones resolvió que el pleito ante sí presentaba una controversia de hechos que requería la celebración de un juicio en su fondo. También hizo mención, por primera vez, de posible dolo y fraude de parte de Pepsi y otros funcionarios públicos. A estos efectos, dispuso:

> Luego de revisar el caso, ciertamente existen varias controversias de hecho que requieren la celebración de un juicio en su fondo para adjudicarse en justicia los derechos de las partes.
>
> A manera de ejemplo, cabe señalar que el contribuyente Pepsi informó ingresos distintos ante dos entes gubernamentales, es decir que hay una conducta que pudiera, de darse unas circunstancias particulares, considerarse ilegal, dolosa o fraudulenta que debe ser evaluada así como los efectos jurídicos.
>
> Otro aspecto que la reconsideración nos ayudó a ver es que la enmienda retroactiva al decreto por parte de la [OECI] ocurrió después que el Municipio de Cidra había determinado la deficiencia contributiva, y por lo tanto la alegada conducta dolosa e ilegal de Pepsi quedaría encubierta por la intervención de unos funcionarios públicos cuya conducta debe ser analizada por el Tribunal.
>
> ....
>
> Las interrogantes que surgen de las alegaciones de las partes, requieren ser clarificadas para determinar si hay responsabilidad legal de esos funcionarios públicos por los perjuicios económicos causados al Municipio de Cidra.

Sentencia en Reconsideración del Tribunal de Apelaciones, págs. 2 y 3.

Un análisis detenido de la prueba provista por las partes nos lleva a concluir que los números señalados por

el Municipio no se pueden comparar de la manera que esta parte surgiere. Los ingresos tributables reportados al Departamento de Hacienda recogen los ingresos netos de Pepsi correspondientes a la Isla entera. De otra parte, los ingresos informados al Municipio están limitados a aquellos ingresos brutos devengados dentro de sus lindes geográficos. Toda vez que Pepsi tenía operaciones en los municipios de Barceloneta y Guayama en adición a Cidra, es lógico que los números no concuerden. Pepsi efectivamente rebatió la alegada controversia de hechos planteada por el Municipio.

En cuanto a la conclusión del Tribunal de Apelaciones concerniente a la conducta posiblemente dolosa o ilegal de Pepsi y los funcionarios públicos relacionados, es menester notar que el Municipio aclaró en su alegato que ello no fue una alegación ni conclusión solicitada de su parte. Una vez resuelto que la diferencia numérica se explicó razonablemente, no consta prueba alguna en el récord para fundamentar las insinuaciones de dolo o fraude planteadas por el Tribunal de Apelaciones.

Por consiguiente, erró el tribunal apelativo intermedio al especular que pudo haber conducta dolosa de parte de Pepsi, y que la diferencia entre las planillas presentadas al Municipio y el Departamento de Hacienda constituía una controversia real que impedía que el caso de autos se resolviera por la vía sumaria.

**V**

Desde un principio, la pregunta medular de este litigio ha sido si Pepsi podía eximir un cincuenta por ciento (50%) del volumen de sus negocios del cobro de patentes municipales. En su notificación preliminar y durante los procesos administrativos y judiciales subsiguientes, el Municipio caracterizó la deficiencia de Pepsi como el resultado de ésta haber calculado sus patentes municipales a base de dicha exención. A tal efecto, Pepsi manifestó lo siguiente en su *Moción Solicitando Sentencia Sumaria*:

> [N]o existe controversia entre las partes de que la razón para alegar la existencia de una deficiencia por parte del [Municipio], es su posición de que las demandantes deben tributar para fines de patente municipal el total del volumen de ventas que aparece en sus estados, sin poder reducir el 50% que corresponde a sus afiliadas bajo el método de *"profit split"*.

Igualmente, en su alegato, el Municipio identificó la controversia fundamental como la siguiente:

> [L]a forma en que se computará el "volumen de negocios" para determinar el pago sobre las patentes municipales; si corresponde el método de contabilidad utilizado por los peticionarios en contribución sobre ingresos llamado "profit-split" o si se debe utilizar la definición de "volumen de negocios" dispuesta en la Ley de Patentes Municipales….

Según ya establecimos, el decreto enmendado de Pepsi le confirió el derecho de calcular sus patentes municipales a base de la mitad del volumen de sus negocios atribuibles a operaciones en el Municipio. Luego, sobre

esa cantidad, Pepsi gozaba de una exención de sesenta por ciento (60%). Lo que entonces resta por determinar es, si a base de esta fórmula todavía existe alguna deficiencia en sus patentes. La respuesta es tan fácil como entrar la cifra adecuada – es decir, el volumen de negocio de Pepsi atribuible a sus operaciones en el Municipio – en la ecuación antes descrita.

Como parte de su investigación de las patentes municipales rendidas por Pepsi, el Director de Finanzas de Cidra verificó la existencia de las deficiencias notificadas usando como punto de comparación los números reflejados en las declaraciones de volumen de negocios radicadas por Pepsi en el Municipio para cada uno de los cuatro (4) años investigados.[35] Según la tabla incorporada a la notificación preliminar del Municipio para demostrar las deficiencias particulares, éste interpretó el monto denominado "*Total Sales*" en las declaraciones de volumen de negocios como el verdadero volumen de negocio de Pepsi producido en el Municipio, y no el que Pepsi había reportado en sus planillas.

Sin embargo, Pepsi argumenta que la cifra en la cual se enfocó el Municipio, es decir, "*Total Sales*", representa la suma total de las ventas atribuibles al Municipio, más aquellas realizadas por las afiliadas de

---

[35] Los documentos se titulaban "*Calculation of Taxable Volume of Business per Municipality*". Además, el Municipio también se basó en los estados financieros de Pepsi.

Pepsi en los Estados Unidos.  De acuerdo a la matemática reflejada en las declaraciones de volumen de negocios de Pepsi, se tenía que restar una cantidad designada como "*Export Sales*" de los "*Total Sales*" para llegar al volumen de negocio de Pepsi realmente devengado en el Municipio, es decir, "*Local Sales*".[36]  Es a base de este número, según Pepsi, que se aplica la exención de cincuenta por ciento (50%) para determinar el volumen de negocio sujeto a patentes municipales.  Argumenta que de la otra manera se estarían imponiendo contribuciones sobre ingresos que nunca le pertenecieron a Pepsi.

Por lo tanto, las partes no nos han puesto en posición para poder determinar con certeza cuál fue el volumen de negocio de Pepsi dentro del Municipio que se debería usar para calcular las patentes municipales correspondientes a los años contributivos del 2000 al 2004.  El expediente no contiene las planillas ni las declaraciones de volumen de negocio radicadas por Pepsi en el Municipio para cada uno de los años investigados.  Tampoco obra una explicación detallada de la contabilidad de Pepsi en su declaración de volumen de negocios, o se advierte en qué consisten los "*Export Sales*" que alegadamente no se pueden incluir en el concepto de ventas llevadas a cabo desde el Municipio.

---

[36]     También surge que Pepsi le sumaba la partida de "*Interest and Other Income*" a la de "*Local Sales*" para llegar a un total para el Municipio, y luego le restaba una partida llamada "*2J Interest Income*" antes de aplicarle la exención de cincuenta por ciento (50%) en calidad de *profit split*.

Ciertamente, la cifra que últimamente se utilizará en calidad de volumen de negocio atribuible a operaciones en el Municipio tendrá que reunir los criterios expuestos en la Ley de Patentes Municipales. 21 L.P.R.A. sec. 651a(a)(7) (2005). Después de todo, el decreto de exención contributivo no alteró la definición de volumen de negocio sujeto a patentes municipales, sino que proveyó que esa cantidad se redujera por la mitad.

## VI

De conformidad a todo lo anteriormente indicado, se revoca la Sentencia en Reconsideración de 15 de diciembre de 2007 emitida por el Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia, Sala de Caguas, para que las partes provean la información necesaria y dicho tribunal determine si, a base de la fórmula aquí clarificada, existe deficiencia alguna en las patentes municipales de Pepsi.

Se dictará Sentencia de conformidad.

ROBERTO FELIBERTI CINTRÓN
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| PEPSI-COLA MANUFACTURING INTERNATIONAL LIMITED; PEPSICO PUERTO RICO, INC.<br><br>Peticionarios<br><br>v.<br><br>DIRECTOR DE FINANZAS DEL MUNICIPIO AUTÓNOMO DE CIDRA Y OTROS<br><br>ELIZABETH APONTE RIVERA, EN SU CAPACIDAD OFICIAL COMO DIRECTORA DE LA OFIC. DE EXENCIÓN CONTRIBUTIVA INDUSTRIAL DEL DEPTO. DE ESTADO, ESTADO LIBRE ASOCIADO DE PUERTO RICO<br><br>Recurridos<br><br>PEPSI-COLA MANUFACTURING INTERNATIONAL LIMITED; PEPSICO PUERTO RICO, INC.<br><br>Recurridos<br><br>v.<br><br>DIRECTOR DE FINANZAS DEL MUNICIPIO AUTÓNOMO DE CIDRA Y OTROS<br><br>ELIZABETH APONTE RIVERA, EN SU CAPACIDAD OFICIAL COMO DIRECTORA DE LA OFIC. DE EXENCIÓN CONTRIBUTIVA INDUSTRIAL DEL DEPTO. DE ESTADO, ESTADO LIBRE ASOCIADO DE PUERTO RICO<br><br>Peticionarios | Núm.: **CC-2008-0136**<br><br>consolidado con<br><br>**CC-2008-0140** | *Certiorari* |

SENTENCIA


En San Juan, Puerto Rico, a 25 de septiembre de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se revoca la Sentencia en Reconsideración de 15 de diciembre de 2007 emitida por el Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia, Sala de Caguas, para que las partes provean la información necesaria y dicho tribunal determine si, a base de la fórmula clarificada en la Opinión de este Tribunal, existe deficiencia alguna en las patentes municipales de los peticionarios Pepsi-Cola Manufacturing International, Limited y Pepsico Puerto Rico, Inc.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton concurre con el resultado sin opinión escrita. El Juez Asociado señor Estrella Martínez disiente con opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Pepsi-Cola Manufacturing International Limited; PepsiCo Puerto Rico, Inc.<br><br>    Peticionarios<br><br>       v.<br><br>Director de Finanzas del Municipio Autónomo de Cidra y otros<br><br>Elizabeth Aponte Rivera, en su capacidad oficial como Directora de la Ofic. de Exención Contributiva Industrial del Depto. de Estado, Estado Libre Asociado de Puerto Rico<br><br>    Recurridos | CC-2008-0136 |
| Pepsi-Cola Manufacturing International Limited; PepsiCo Puerto Rico, Inc.<br><br>    Recurridos<br><br>       v.<br><br>Director de Finanzas del Municipio Autónomo de Cidra y otros<br><br>Elizabeth Aponte Rivera, en su capacidad oficial como Directora de la Ofic. de Exención Contributiva Industrial del Depto. de Estado, Estado Libre Asociado de Puerto Rico<br><br>    Peticionarios | Cons.<br><br><br><br>CC-2008-0140<br><br><br><br><br>Certiorari |

Opinión disidente emitida por el Juez Asociado señor Estrella Martínez

San Juan, Puerto Rico, a 25 de septiembre de 2012.

La decisión que hoy acoge la mayoría de este Tribunal aprueba la actuación de la Oficina de Exención

Contributiva Industrial (OECI) para enmendar sustantivamente un decreto de forma retroactiva sin autoridad legal y en contravención a la intención legislativa plasmada en la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651, *et seq.*, según enmendada y la Ley de Incentivos Contributivos de 1998, 13 L.P.R.A. secs. 10101, *et seq.*

Respetuosamente, no coincido con la mayoría de este Tribunal en que la OECI tiene facultad para enmendar de forma retroactiva un decreto de incentivo contributivo. Tampoco puedo categorizar que las actuaciones por la OECI constituyen una mera aclaración cuando en realidad éstas son una enmienda sustantiva con carácter retroactivo de un decreto. El efecto de la determinación de la mayoría repercute en la autoridad delegada a los municipios para imponer y cobrar contribuciones dentro de sus límites territoriales. De esta forma, se abren las puertas a crear un estado de incertidumbre en la planificación de la administración de los fondos públicos municipales y se propicia la inestabilidad fiscal de los municipios, al avalarse supuestas "aclaraciones" retroactivas de forma sorpresiva y que tienen un impacto negativo millonario al fisco.

I

PepsiCo Puerto Rico, Inc. (PepsiCo) es una corporación que opera en Puerto Rico y la cual ha estado cobijada por los beneficios de la Sección 936 del Código

Federal de Rentas Internas, 26 U.S.C.A. sec. 936. Ésta se acogió al método de contabilidad aprobado en el 1982 conocido como *profit split,* 26 U.S.C.A. sec. 936 (h)(5)(C)(ii).[37] Bajo esta regla contable, para determinar su obligación contributiva al fisco, PepsiCo se beneficiaba de distribuir el ingreso tributable en un cincuenta por ciento a su matriz en los Estados Unidos y el restante a su afiliada en Puerto Rico. De igual forma, desde el 1977 gozó de exenciones contributivas locales a través de decretos emitidos por el Gobierno de Puerto Rico al amparo de las distintas leyes de incentivos industriales. En ese entonces, los decretos a favor de PepsiCo disponían que, para efectos de computar el pago de patentes municipales, el volumen de negocio sería el cincuenta por ciento de éste si la empresa estaba acogida al método de *profit split*.

---

[37]El método de *profit split* en su parte pertinente, disponía:

(ii) Profit split-

(I) General rule -- If an election of this method is in effect, the electing corporation's taxable income derived from the active conduct of a trade or business in a possession with respect to units of a product produced or type of services rendered, in whole or in part, by the electing corporation shall be equal to 50 percent of the combined taxable income of the affiliated group (other than foreign affiliates) derived from covered sales of units of the product produced or type of service rendered, in whole or in part, by the electing corporation in a possession.

Como las distintas leyes de incentivos contributivos se establecen por periodos determinados, PepsiCo solicitó una nueva exención contributiva en el 2000 conforme a la Ley Núm. 135-1997, Ley de Incentivos Contributivos de 1998, 13 L.P.R.A. sec. 10101, *et seq*. A tales efectos, la Oficina de Exención Contributiva Industrial (OECI) adscrita al Departamento de Estado tramitó la solicitud y el Secretario de Estado aprobó el decreto el 3 de febrero de 2000 (decreto del 2000). El decreto (98-135-I-111) disponía, en lo pertinente, como sigue:

> BE IT FURTHER DECREED, that pursuant to Section 6(b)[38] of the Act, Grantee shall enjoy sixty percent (60%) exemption form license fees, excises, and other Municipal Taxes of: (i) July 1, 2000 with respect to the production of concentrate products, and (ii) July 1, 2002 with respect of the production of snack foods and pork rind pellets ("chicharrones").

Conforme al lenguaje claro del decreto, PepsiCo pagaría patentes por el cuarenta porciento de su volumen de negocios. Posteriormente, el 5 de agosto de 2002, el decreto se enmendó para incluir a Pepsi-Cola Manufacturing International, Limited (Pepsi-Cola), como beneficiario adicional (98-135-I-111-A). Luego, Pepsi-Cola adquirió de PepsiCo la planta manufacturera de concentrado de bebidas en el Municipio de Cidra, y continuó con las operaciones de producción.[39]

---

[38]13 L.P.R.A. sec. 10105(b).

[39]Para la fácil comprensión de los hechos y concordancia con la Opinión mayoritaria, nos referimos a PepsiCo y a Pepsi-Cola como Pepsi.

El inicio de la controversia ante nos surge cuando el Municipio de Cidra notificó el 16 de agosto de 2005 una deficiencia de $15,087,134.66 en el pago de patentes municipales para los años contributivos del 2000 al 2004. La deficiencia notificada respondió a que Pepsi no incluyó el cincuenta por ciento de su volumen de negocios para el pago de patentes municipales. Es decir, Pepsi únicamente pagó patentes municipales por el cuarenta porciento de la mitad de su volumen de negocios.

El 19 de agosto de 2005 Pepsi impugnó la deficiencia notificada, por lo que se celebró la correspondiente vista. Luego de los trámites de rigor, el 14 de diciembre de 2005 el Municipio de Cidra emitió su decisión final sobre la deficiencia. Pepsi solicitó el juicio de novo ante el Tribunal de Primera Instancia.[40]

Mientras se llevó a cabo el proceso de deficiencia ante el Municipio de Cidra, Pepsi solicitó el 14 de noviembre de 2005 ante la OECI "a request for **Amendment** of Tax Exempcion Grant, Case, No. 98-135-I-111".[41] Argumentó que ello era con el propósito de clarificar que determinaron correctamente el volumen de negocios para el pago de patentes municipales. El Municipio de Cidra se opuso a la enmienda solicitada ante la OECI. A pesar de ello, el 2 de junio de 2006, se aprobó con efecto

---

[40]Pepsi prestó una fianza por $16,444,976.79.

[41]Véase, Ap. CC-2008-0136, págs. 126-127.

retroactivo la enmienda al decreto del 2000 solicitada por Pepsi. A estos efectos, la nueva enmienda (98-135-III-111-C) estableció como sigue:

> BE IT FURTHER DECREED, that pursuant to Section 6(b) of the Act, Grantee shall enjoy sixty percent (60%) exemption form license fees, excises, and other Municipal Taxes of: (i) July 1, 2000 with respect to the production of concentrate products, and (ii) July 1, 2002 with respect of the production of snack foods and pork rind pellets ("chicharrones"), **provided that Grantee's sales volume with respect to sales covered by profit-split election under Section 936 of the United States Internal Revenue Code of 1986 shall be fifty percent (50%) of the sales amount,** and it sales volume with respect to sales covered by the cost sharing election shall be one hundred percent (100%) of the sales amount. (Énfasis suplido.)

La enmienda repercutió en los procedimientos de juicio de novo relacionados con la deficiencia notificada por el Municipio de Cidra y ante la consideración del Tribunal de Primera Instancia. Ante la realidad del nuevo decreto, el Municipio trajo como tercero demandado al Estado y a la OECI para declarar nula la enmienda al decreto de exención al sostener que se actuó de forma *ultra vires.* Por su parte, el Estado solicitó la desestimación de la demanda en su contra y sentencia sumaria a su favor. El Municipio se opuso.

En lo relevante, el Tribunal de Primera Instancia emitió el 29 de marzo de 2007 una sentencia en la que dejó sin efecto la determinación de deficiencia del Municipio de Cidra y declaró "no ha lugar" la demanda del municipio contra el Estado y la OECI. Para ello, el foro primario

concluyó, entre otras, que cuando la OECI aprobó "la enmienda al decreto de exención contributiva industrial con aplicación retroactiva al 3 de febrero de 2000 la controversia planteada quedó aclarada por lo que la determinación del Municipio Autónomo de Cidra en torno a las deficiencias notificadas a Pepsi no puede prevalecer".[42]

Ante ese cuadro fáctico, el Municipio de Cidra acudió oportunamente ante el Tribunal de Apelaciones. Originalmente, el 10 de agosto de 2007 el foro intermedio emitió una sentencia en la que revocó al Tribunal de Primera Instancia y ordenó la celebración de un juicio en su fondo por entender que existían controversias materiales que impedían dictar sentencia sumaria. A pesar de ello, el Tribunal de Apelaciones confirmó al foro primario a los efectos de la determinación sobre la competencia del tribunal de instancia para revisar la enmienda al decreto realizada a base de la Ley de Incentivos Contributivos de 1998.

Posteriormente, y luego de sendas solicitudes de reconsideración, el Tribunal de Apelaciones emitió el 15 de diciembre de 2007 una sentencia en reconsideración. En ésta última revocó en su totalidad la sentencia del Tribunal de Primera Instancia y devolvió el caso a ese foro para la celebración de un juicio en su fondo. Entre otras controversias, señaló que la enmienda retroactiva no

---

[42]Véase, Ap. CC-2008-0136, pág. 268.

podía privar al Municipio de Cidra de su facultad para imponer patentes municipales.

La sentencia en reconsideración dio lugar a la presentación de dos recursos ante este Tribunal. Pepsi compareció mediante el recurso de *certiorari* número CC-2008-0136 y el Estado, por su parte, mediante el recurso de *certiorari* CC-2008-0140. Ambos recursos fueron expedidos y consolidados por este Tribunal.

## II

En cuanto a los planteamientos sobre la legitimación activa del Municipio de Cidra para impugnar la determinación de la OECI, y la facultad de este Tribunal para revisar las actuaciones de dicha entidad a los fines del decreto enmendado, coincido con la Opinión mayoritaria.[43]

Por otra parte, discrepo en que Pepsi cualifique para una exención al pago de patentes municipales adicional a la que obtuvo al aprobarse el decreto del 2000 al amparo de la Ley de Incentivos Contributivos de 1998. Diverjo en cuanto a que la Ley de Incentivos de 1998 permite la enmienda de decretos con carácter retroactivo, cuyo efecto real es modificar la facultad de los Municipios en el cobro de patentes municipales a base del decreto

---

[43]Igualmente, declararía sin lugar la moción de desestimación presentada por el Municipio de Humacao. Asimismo, avalo la exposición que realiza la Opinión mayoritaria sobre la sección 936, sus implicaciones al fisco y sobre la ley de patentes municipales y el alcance de la enmienda promulgada a ésta en el 1991.

originalmente emitido. Entiendo que ello es contrario a la ley y al orden público y constituye un detrimento a fortalecer el erario municipal en favor de sus ciudadanos. Veamos.

III

**A.   La Sección 936 del Código Federal de Rentas Internas,**
**los incentivos contributivos en Puerto Rico y las**
**patentes municipales.**

La Sección 936 sirvió como la fuente principal para el desarrollo económico de Puerto Rico. Ésta constituyó la base para que empresas extranjeras invirtieran en nuestra jurisdicción al concederles un incentivo contributivo. La Sección 936 proveía una exención a modo de crédito contributivo sobre todos los ingresos derivados por las empresas norteamericanas en Puerto Rico relacionados con los negocios en la isla de cumplirse ciertas condiciones. Francisco Hernández-Ruiz, A guide across the spectrum of Section 936, 19 Rev. Jurídica U. Inter. P.R. 131 (1984).

Posteriormente, los beneficios de la Sección 936 sufrieron modificaciones sustantivas para atender la preocupación del Tesoro de los Estados Unidos con relación a la metodología empleada para aprovecharse de los beneficios que ésta disponía y el efecto de los favores contributivos versus el objetivo de la Sección 936. Carlos E. Díaz Olivo, La Autonomía de Puerto Rico y sus Lecciones en Términos Fiscales y Económicos, 74 Rev. Jur. U.P.R. 263, 280 (2005).[44]

---

[44]Véase, además, Lorraine Eden, Puerto Rican Transfers and Section 936, 9 Tax Notes International 37, July 4, 1994,http://www.voxprof.com/eden/Publications/puertoricant ransfersandsection936.pdf (última visita 12 de julio de 2012).

Como consecuencia, la Sección 936 sufrió varias enmiendas entre las que destacamos la del 1982. En lo pertinente, se incluyó el denominado *profit split* como un método contable para la distribución del ingreso sujeto al pago de contribuciones sobre ingresos. Bajo este procedimiento se ofreció como alternativa prorratear a razón de cincuenta porciento el ingreso sujeto a contribución a la corporación operando bajo la Sección 936 y el otro cincuenta porciento a su afiliada en los Estados Unidos. F. Hernández-Ruiz, *supra*, págs. 146-147.

Por su parte, y dentro de la estrategia de desarrollo económico local, el Gobierno de Puerto Rico propició varias leyes de incentivos industriales. Véase, <u>Pfizer Pharm. v. Mun. de Vega Baja</u>, 182 D.P.R. 267 (2011). En lo que concierne al caso de autos, las leyes de incentivos de 1948, la de 1954 y la de 1963 disponían una exención total de su ingreso a los negocios elegibles declarados como tal por el Gobernador. Estas legislaciones disponían expresamente que los negocios exentos no estarían sujetos al pago de las patentes, arbitrios y otras contribuciones municipales impuestas por cualquier ordenanza de cualquier municipalidad. Véanse, 1948 Leyes de Puerto Rico, 482; 13 L.P.R.A. secs. 10001(c) y 10012(c).

Posteriormente, se aprobó la Ley de Incentivos Industriales de Puerto Rico de 1978, 13 L.P.R.A. sec. 10024, *et seq.* Bajo esta pieza legislativa se incorporó, por primera vez, el mecanismo de exención parcial sobre la

tributación. Mediante ésta, como regla general, Puerto Rico impuso una contribución retenida en el origen del diez porciento de los ingresos tributables. Véase 13 L.P.R.A. sec. 10026 (a). Diez años más tarde, la Ley de Incentivos Contributivos de 1987, siguió el modelo de la ley de 1978 de exenciones parciales. 13 L.P.R.A. sec. 10040.

Con relación al pago de patentes, tanto la Ley de Incentivos Industriales de Puerto Rico de 1978 como la Ley de Incentivos Contributivos de 1987, contenían disposiciones expresas sobre las exenciones relacionadas con el pago de las patentes municipales.

Por su parte, la ley de 1978 dispuso que los negocios exentos no estarían sujetos al pago de las patentes, arbitrios y otras contribuciones municipales. 13 L.P.R.A. sec. 10026(c). Sin embargo, la ley de 1987 disminuyó el beneficio a los negocios exentos al disponer que solamente gozarían de un sesenta porciento de exención sobre el pago de las patentes, arbitrios y contribuciones municipales. 13 L.P.R.A. sec. 10040 (c). La razón de este cambio respondió al reclamo de los alcaldes sobre la necesidad de obtener mayores recursos en sus municipios. Véase, Debate sobre el P. del C. 1302 del 8 de agosto de 1991, pág. 42

Este escenario conllevó la aprobación del P. del C. 1302 que se convirtió en la Ley Núm. 82-1991, *supra*, a los fines de enmendar la Ley de Patentes Municipales. El propósito general de la Ley Núm. 82, *supra*, consistió en

fortalecer la segunda fuente de ingresos de los municipios para otorgarles mayor autonomía fiscal en aras de mejorar los servicios que éstos prestan a la ciudadanía.

Por otra parte, y debido a las diferencias en el trato al cobro de patentes municipales por las distintas leyes de incentivos industriales, se recomendó que la Ley de Patentes Municipales excluyera los fondos 936 del cómputo de patentes municipales. El Secretario de Hacienda expuso la preocupación de empresas que operaban bajo las leyes de incentivos industriales. Ello, debido a que los municipios pretendían impugnar la exención contributiva total concedida por las leyes de incentivos industriales anteriores a las de 1987. Por tal razón, el 5 de junio de 1991 el Secretario de Hacienda propuso que la Ley de Patentes Municipales reconociera una exención para aclarar el panorama. Para ello recomendó se creara la siguiente exoneración al pago de patentes municipales:

> Los ingresos provenientes de fondos elegibles invertidos de conformidad con la Sección 2(j) de la Ley Núm. 8 del 24 de enero de 1987, según enmendada [Ley de Incentivos Contributivos de Puerto Rico de 1987], y leyes de incentivos industriales anteriores **y subsiguientes**, devengados por un negocio que es o fue un negocio exento bajo cualesquiera de dichas leyes. (Énfasis suplido.) Véase, Ponencia del Secretario de Hacienda del 5 de junio de 2011 sobre el P. de la C. 1302, pág. 6.

De igual forma, se expresó la Asociación de Industriales de Puerto Rico en su Ponencia del 13 de junio de 1991 sobre el P. de la C. 1302, pág. 10. Ésta enunció como fundamento adicional que el Departamento de Hacienda

reconocía ciertos ajustes a las empresas 936 para fines de la contribución sobre ingresos, por lo que entendió que era apropiado reconocer ese privilegio para propósitos de la patente municipal. Por su parte, el Banco Gubernamental de Fomento para Puerto Rico aclaró el 13 de junio de 1991 que cualquier aumento en el porciento de patentes que se declaran a favor del municipio tiene el efecto de rebajar la contribución sobre ingresos de las corporaciones. Ello debido a que el pago por patentes "es totalmente deducible cuando se realiza el cómputo de la responsabilidad contributiva anual de los negocios". Véase, Ponencia del Banco Gubernamental de Fomento para Puerto Rico sobre el P. del C. 1302 de 13 de junio de 1991.

Por su parte, del Informe de la Administración de Fomento Económico con relación al P. del S. 1056 relacionado con el P. de la C. 1302 del 28 de mayo de 1991 recomendó que se limitara la exención por el pago de patentes municipales a las leyes de incentivos de 1987 y anteriores a ésta. Así, entendió que procedía eliminar cualquier referencia a los efectos de leyes de incentivos subsiguientes. La razón para ello consistió en limitar el objetivo de la Ley Núm. 82, *supra*, a esclarecer la situación existente para los municipios.

Finalmente, la Ley Núm. 82, *supra*, fue aprobada y como consecuencia el inciso 27 de la Sección 9 de la Ley de Patentes Municipales, 13 L.P.R.A. sec. 651h(27), permitió la exención por el pago de patentes municipales a

los negocios acogidos a las leyes de incentivos industriales hasta el 1987 al emplear el siguiente lenguaje:

> Los ingresos, no atribuibles a operaciones en Puerto Rico, de corporaciones exentas **bajo la Ley Núm.8 de 24 de enero de 1987, según enmendada, y leyes de incentivos industriales anteriores**, de conformidad con las disposiciones de las Secciones 936 y 482 del Código de Rentas Internas Federal. (Énfasis suplido.)

Ahora bien, el 31 de julio de 1996, el Congreso de los Estados Unidos estableció un plazo de diez años para la eliminación de la Sección 936. Durante ese período, y consciente de ello, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 135-1997, Ley de Incentivos Contributivos de 1998, 13 L.P.R.A. sec. 10101, *et seq.*, cuya vigencia culminaría el 31 de diciembre de 2007. Al aprobarla, la Asamblea Legislativa consideró el cambio en los modelos económicos a nivel mundial y la necesidad de contar con un mecanismo de incentivos contributivos autóctonos. Véase, Exposición de Motivos de la Ley Núm. 135-1997, *supra*.

En cuanto al pago de patentes, la Ley de Incentivos Contributivos de 1998 dispone que los negocios exentos que poseen un decreto otorgado bajo ésta, gozarán de un sesenta porciento hasta un noventa porciento de exención sobre patentes, arbitrios y contribuciones municipales dependiendo del tipo de negocio. 13 L.P.R.A. sec. 10105(b). Lo expuesto refleja que la Ley de Incentivos Contributivos de 1998 siguió el patrón establecido en la

Ley de Incentivos de 1987 a los efectos de no permitir una exoneración total por el pago de patentes municipales. A pesar de ello, y contrario a lo que pasó al aprobar la Ley Núm.82-1991, la Ley de Patentes Municipales no fue enmendada al aprobarse la Ley de Incentivos Contributivos de 1998 para permitir que los negocios exentos no pagaran patentes municipales en su totalidad.

El historial expuesto refleja que indudablemente no existía una obligación de pagar patentes municipales a los negocios exentos al amparo de las leyes de incentivos industriales cobijados hasta el 31 de diciembre de 1997.[45] Ello no aplicó automáticamente a aquellos negocios que disfrutaron decretos a base de la Ley de Incentivos Contributivos de 1998.

Ante tal realidad, la Opinión mayoritaria se da a la tarea de auscultar la posibilidad de que un decreto al amparo de la Ley de Incentivos Contributivos de 1998 pueda enmendarse y tener un efecto retroactivo. Es de ese análisis del cual discrepamos.

**B.  Validez de la enmienda al decreto del 2000 y su efecto retroactivo**

Al amparo de la Ley de Incentivos Contributivos de 1998 se concedían exenciones sobre el pago de patentes municipales conforme a los decretos emitidos a estos efectos. Por su naturaleza, las exenciones de

---

[45]Éste corresponde al periodo de vigencia de la Ley de Incentivos Industriales de 1987.

contribuciones industriales constituyen un instrumento para fomentar la industria y la inversión productiva. Textile Dye Works, Inc. v. Secretario de Hacienda, 95 D.P.R. 708, 713 (1968). Sin embargo, ello no implica que éstos no deban cumplir con ciertos requisitos y que las partes no queden obligadas a base de sus términos.

La naturaleza de estos decretos es una contractual entre el Gobierno y el concesionario, sus accionistas, socios o dueños, cuyo periodo tenía una vigencia entre diez a veinticinco años dependiendo del área en la que se localiza la empresa. 13 L.P.R.A. secs. 10112(f) y 10105(d); Pfizer Pharm. v. Mun. de Vega Baja, *supra*; Qume Caribe, Inc. v Srio. de Hacienda, 153 D.P.R. 700, 730 (2001); Textile Dye Works, Inc. v. Secretario de Hacienda, *supra*. Es por ello que, una vez emitido el decreto, las partes estaban obligadas al cumplimiento de lo dispuesto en éste con todas sus condiciones. Además, este Tribunal ha resuelto que cuando los términos del decreto eran claros y no dejaban lugar a dudas sobre la intención de las partes el decreto se entendería en su sentido literal. Pfizer Pharm. V. Mun. de Vega Baja, *supra*, pág. 283; Qume Caribe, Inc. v Srio. de Hacienda, *supra*, págs. 729-730.

A grandes rasgos el proceso para conceder estos decretos consiste en una solicitud presentada ante el Director de la OECI, adscrita al Departamento de Estado. Ésta se remitía al Secretario de Hacienda para que

verificara el cumplimiento de los accionistas con sus responsabilidades contributivas y al Administrador de Fomento Económico, o aquellas agencias o instrumentalidades pertinentes. Eventualmente, se preparaba un proyecto de decreto a ser circulado entre las agencias concernidas, **así como al municipio correspondiente** y al Centro de Recaudaciones de Impuestos Municipales **para la evaluación económica y fiscal pertinente.** 13 L.P.R.A. sec. 10112 (j)(2). Luego de la correspondiente evaluación, y recomendación del Director de la OECI, el Secretario de Estado emite una determinación final sobre la concesión del decreto. 13 L.P.R.A. sec. 10112. Estas decisiones y determinaciones se consideran como finales y no procedía su revisión, excepto en ciertas circunstancias. 13 L.P.R.A. sec. 10114. Indudablemente, una de estas instancias en las que procede la revisión sobre estas determinaciones es cuando éstas son *ultra vires.*

Como expresamos en Pfizer Pharm. V. Mun. de Vega Baja, *supra*,[46] "cada Decreto es único y su negociación ha

---

[46]En ese entonces, resolvimos que el municipio de Vega Baja estaba facultado para imponer el pago de patentes municipales a base del decreto concedido bajo la Ley de Incentivos Contributivos de 1998. La única limitación que le impusimos al municipio fue la cantidad dispuesta en la ley y acordada en el decreto que fue emitido. En ese caso, no estábamos ante una alegada aclaración del decreto o enmienda a éste. Allí indicamos que no podíamos limitarnos al análisis de si una partida es o no tributable para fines del Código de Rentas Internas, pues había un decreto que regulaba la relación de las partes. A tenor con ello,

conllevado un estricto análisis de la solicitud y las circunstancias particulares de los contratantes. El Decreto incluye, además, la participación del municipio concernido". Íd, pág. 283. Así, el decreto especifica las condiciones mediante las cuales se otorga la exención contributiva solicitada, el porcentaje de ésta, término de duración y otras condiciones. Qume Caribe, Inc. v. Srio. de Hacienda, *supra*, pág. 720. Debemos recordar que las leyes de incentivos industriales no constituyen leyes de contribuciones sobre ingresos. Su propósito consiste en establecer una exención contributiva a empresas que se dedican a ciertas actividades. Íd., pág. 726.

Al examinar la Ley de Incentivos Contributivos de 1998, coincidimos que el estatuto permite la concesión de exenciones sobre el pago de patentes municipales. Véase, 13 L.P.R.A. sec. 10105(b). De esta forma, se reguló la potestad de los municipios para imponer el cobro de patentes a aquellos negocios elegibles bajo la Ley de Incentivos Contributivos de 1998. Asimismo, reconocemos la discreción al emitir los decretos bajo este estatuto y la obligación de los municipios a respetar estos acuerdos.

A pesar de ello, no podemos avalar la contención de la mayoría de este Tribunal sobre las actuaciones realizadas posterior a la deficiencia notificada a Pepsi por el Municipio de Cidra a base del decreto emitido en el

---

nos limitamos a examinar y avalar las acciones del municipio conforme al decreto emitido.

2000. De igual forma, entendemos que -en efecto- el decreto del 2000 fue enmendado retroactivamente.

Al revisar la Ley de Incentivos Contributivos de 1998 notamos que el estatuto contempla la posibilidad de enmiendas a las concesiones aprobadas y la renegociación, conversión y extensión del decreto. Véase, 13 L.P.R.A. secs. 10112 (j)(2) y 10107. Sin embargo, no encontramos que la Asamblea Legislativa haya delegado la facultad de enmendar de forma retroactiva un decreto emitido a base de ésta. Por el contrario, cuando se refiere a renegociaciones, conversiones o extensiones del decreto, la ley dispone varios factores a considerar entre los que destaca el **remanente del período del decreto** a los fines de que se pueda obtener un nuevo decreto con beneficios contributivos ajustados. 13 L.P.R.A. sec. 10107. A su vez, la ley considera la posibilidad de que los decretos posean una enmienda posterior a los fines de cubrir operaciones en otros municipios. 13 L.P.R.A. sec. 10105 (b)(1). Entendemos que ello responde a que al evaluar la concesión de un decreto se considera la repercusión económica que ello conlleva para distintas entidades incluyendo los municipios. Es por ello, que como parte del proceso se envía copia de la solicitud a los municipios para la evaluación económica y fiscal correspondiente. Por tanto, un cambio -como el de autos- en el decreto emitido afecta los fondos públicos e ingresos municipales con los que un municipio contó para establecer su presupuesto en

beneficio de sus ciudadanos. Tal actuación es contraria al orden público y la ley.

IV

Los hechos ante nos revelan que Pepsi disfrutaba de un decreto de exención concedido en virtud de la Ley de Incentivos Contributivos de 1998. Éste disponía para una exención del sesenta porciento del pago de patentes municipales. Así, sus términos eran claros y sin ambigüedades, por lo que Pepsi se obligó a ellos. Conforme lo establecido por el decreto, el Municipio determinó y notificó una deficiencia porque Pepsi sólo incluyó el pago por el cuarenta porciento de la mitad del volumen de su negocio para el cómputo de su patente municipal. Ésta adujo que ello respondió a su elección del método de *profit split* para la determinación de su contribución sobre ingresos y a su conclusión errada de que le aplicaba el inciso 27 de la Sección 9 de la Ley de Patentes Municipales.[47]

Como consecuencia de la notificación de deficiencia, Pepsi solicitó una enmienda a su decreto del 2000. Luego de varios procesos, el decreto fue enmendado para incluir las defensas de Pepsi ante el Municipio de Cidra al

---

[47]No debe existir duda alguna que la base para la determinación del pago de patentes municipales no necesariamente corresponde o equivale a aquella utilizada para el pago de contribuciones sobre impuestos. La definición de lo que constituye volumen de negocios es una clara y está contemplada en la Ley de Patentes Municipales.

notificar la deficiencia. Con esta actuación, *de facto*, se enmendó de forma retroactiva el decreto. La Ley de Contribuciones de Incentivos de 1998 no provee para ello.

La Opinión mayoritaria sostiene –a base de la solicitud de sentencia sumaria mediante la cual el foro de instancia dispuso del presente caso– que la intención original de Pepsi y el Estado fue eximir la mitad del volumen de negocios de la empresa. No podemos avalar tal razonamiento. Tampoco podemos concluir a base de documentos cuál fue la intención de las partes cuando ésta no consta reflejada en el decreto del 2000.

La enmienda añadió y aumentó la exención contributiva concedida a Pepsi en el decreto del 2000. La misma no constituye una aclaración de que Pepsi seguiría beneficiándose de los beneficios bajo decretos anteriores. El expediente refleja que en ocasiones anteriores, los decretos emitidos a favor de Pepsi expresamente disponían sobre cómo se llevaría a cabo el cómputo para el pago de patentes municipales, no así el decreto emitido en el 2000. La razón para conceder la referida enmienda consistió en una interpretación de que debía aplicarse a Pepsi los mismos beneficios que ésta tenía bajo la Ley de Incentivos de 1987, ya que seguía operando como una empresa 936. Sin embargo, el hecho de que Pepsi operara como una empresa 936 sólo repercute en su responsabilidad al pagar contribuciones sobre ingresos. Ello no incide en la forma en que se realiza el cálculo para el pago de

patentes municipales a base del volumen de negocios que esa empresa opera en el Municipio de Cidra.[48] Precisamente, tal discrepancia provocó la enmienda por la Ley Núm. 82, *supra*, a la Ley de Patentes Municipales para evitar este tipo de controversias. Como vimos, ésta irrefutablemente no aplica a la Ley de Incentivos de 1998.

Claro está, reconocemos que la OECI podía desde el principio promulgar un decreto en el cual fijara que el cómputo para el pago de patentes se haría conforme el *profit split.* No obstante, no lo podía hacer de forma retroactiva, ya que ello es contrario a la ley debido a que no le fue una facultad delegada por la Asamblea Legislativa. Además, contraviene el orden público al atentar contra la facultad de los municipios para imponer patentes municipales conforme la ley especial para estos fines. De igual forma, no podemos pasar por alto que Pepsi solicitó la enmienda una vez fue determinada la deficiencia por el Municipio. Esta actitud nos resulta más antipática y acomodaticia que el cumplimiento con el proceso de notificar una deficiencia seguido por el Municipio de Cidra.

---

[48]El volumen de negocios se refiere a los ingresos brutos que recibe o devengue una empresa en el municipio en el cual realiza su operación. A los fines de la Ley de Patentes Municipales, el ingreso bruto es la totalidad de ingresos dentro y fuera de Puerto Rico que sean atribuibles a la operación que se lleva a cabo en cada municipio. 21 L.P.R.A. sec. 651a(7). Los beneficios de la Sección 936 son únicamente para fines de la determinación de la contribución sobre ingresos. Éstos no repercuten automáticamente en la Ley de Patentes Municipales.

A base de lo anterior, opinamos que el decreto a favor de Pepsi, con relación al pago de patentes municipales, simplemente le concedía una exención de sesenta porciento sobre la totalidad de su volumen de negocios. Por tanto, el Municipio actuó conforme al decreto y la Ley de Incentivos Contributivos de 1998 y la de patentes municipales al notificar la deficiencia. Es por ello, que procede devolver el caso de epígrafe al Tribunal de Primera Instancia para que atienda en los méritos la impugnación de deficiencia presentada por Pepsi.

## V

Por los fundamentos antes analizados, disentimos de la Opinión mayoritaria. En su lugar, confirmaríamos al Tribunal de Apelaciones conforme a lo aquí expresado.


LUIS F. ESTRELLA MARTÍNEZ
Juez Asociado